## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **[1] PAWNEE NATION OF OKLAHOMA, and** | ) | **Case No. 16-cv-697-JHP-TLW** |
| **[2] WALTER R. ECHO-HAWK,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **[1] SALLY JEWELL, in her official capacity as** | ) | |
| **Secretary of the United States Department of the** | ) | |
| **Interior, [2] UNITED STATES BUREAU OF** | ) | |
| **INDIAN AFFAIRS, and [3] UNITED STATES** | ) | |
| **BUREAU OF LAND MANAGEMENT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

### INTRODUCTION

1.      This case challenges federal oil and gas approvals on Indian trust lands within the Pawnee Nation of Oklahoma. The United States Bureau of Indian Affairs (BIA) and Bureau of Land Management (BLM) have approved numerous new oil and gas leases and drilling permits without complying with federal law, including the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and the American Indian Agricultural Resource Management Act of 1993 (AIARMA).  In doing so, BIA and BLM also have run roughshod over Pawnee natural resource protection laws, disregarded a tribal moratorium on new oil and gas approvals, and violated the agencies' trust responsibilities to the Pawnee.

2.      Past oil and gas development on Indian trust lands under Pawnee tribal jurisdiction (Pawnee lands) has left a legacy of contaminated groundwater, illegal wastewater dumping, and

1

other impacts.  But the stakes have risen substantially in recent years with the growth of hydraulic fracturing and related technologies.  The intensity, scale and complexity of modern hydraulically-fractured wells far exceed the conventional development that has occurred in the past.  Companies today drill wellbores that are nearly three miles long and where fracturing uses millions of gallons of water per well.  The associated surface disturbance, traffic, noise, air pollution, and accidents also have major impacts on surrounding communities and their natural resources.  Most dramatically, geologists have concluded that disposal of hydraulic fracturing wastes can cause earthquakes.

3.      Despite these issues, BIA and BLM have approved numerous new oil and gas leases and drilling permits on Indian-owned land without considering the impacts from that development, or disclosing them to the public.  While BLM and BIA ignored these risks, they have become painfully apparent to the Pawnee: on September 3, 2016, the largest earthquake recorded in Oklahoma history hit the Nation, causing significant damage to many tribal buildings and Indian homes.

4.      The Pawnee Nation and Walter R. Echo-Hawk bring this case to require the federal government to comply with federal and tribal law, and to ensure that the BIA and BLM address the risks to Pawnee land, water, health and safety before approving further oil and gas development.[1]

**JURISDICTION AND VENUE**

5.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), and the waiver of sovereign immunity provided by 5 U.S.C. § 702.  Plaintiffs challenge final agency actions by the BIA and BLM and pursue claims under the Administrative Procedure Act (APA),

---

[1] This case is not related to any previously filed cases in this Court.

5 U.S.C. § 551 et seq, NEPA, 42 U.S.C. § 4321 et seq., AIARMA, 25 U.S.C. § 3701 et seq., Executive Order 11988, the NHPA, 54 U.S.C. § 300101 et seq., and the federal government's trust responsibilities.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred within this judicial district, BIA has an office in this district, and Plaintiff Pawnee Nation is located in this district.

**PARTIES**

7.    Plaintiff Pawnee Nation of Oklahoma (the Pawnee or Nation) is a federally-recognized Indian tribe.  The Nation has approximately 3,200 enrolled members from four confederated bands of Indians (the Chaui, Kitkehahki, Pitahawirata and Skidi).  The Pawnee tribal headquarters are located on the Pawnee tribal reserve at Pawnee, Oklahoma.  Its tribal jurisdiction covers all Indian and tribal trust land within the boundaries of the original Pawnee Indian Reservation in Pawnee County and part of Payne County, including all of the lands, waters and natural resources at issue in this case.  The tribal government is responsible for protecting the health, safety and welfare of tribal members.  It has enacted environmental, conservation and water laws to discharge those responsibilities.  These laws also govern foreign corporations doing business in Pawnee jurisdiction.  Oil and gas development by federal agencies and foreign corporations on land under tribal jurisdiction falls squarely within the governmental and regulatory interests of the Pawnee Nation.

8.    Under its Constitution and laws, the Pawnee tribal government must: ensure that a sufficient supply of good quality water is available to satisfy all present and future tribal uses; safeguard the quality of the available water supply to prevent irreparable destruction of that natural resource from contamination; protect the best interests, health, safety and well-being of

3

its members; and ensure that all foreign corporations doing business in tribal jurisdiction comply with tribal law. The federal oil and gas approvals challenged in this case harm those sovereign interests. The approvals also threaten the safety, well-being, property and interests of tribal members as well as harm land, water, property and other resources for which the Nation is responsible.

9.      By filing this action, the Nation does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

10.     Plaintiff Walter R. Echo-Hawk is a member of the Pawnee Nation and an Indian landowner. His home is located on a Pawnee Indian allotment along the Cimarron River downstream from the leases challenged in this case. Mr. Echo-Hawk also is a partial owner of two of the Indian allotments affected by the federal oil and gas approvals at issue in this case. BIA's and BLM's approvals threaten Mr. Echo-Hawk's health and well-being, affect his enjoyment of his home, the river, and his community, and impact the value of his property.

11.     Mr. Echo-Hawk also has been personally threatened by the company holding the leases and drilling permits at issue in this case, Crown Energy Company. In July 2016, after Mr. Echo-Hawk began investigating Crown's operations and lodged several complaints with BIA and BLM, the company attempted to forcibly prevent him from monitoring its activity. Crown summoned Payne County Sheriff's deputies (according to an incident report) to "keep Mr. Echo Hawk away from" a company drilling site because allegedly "he would cause problems to their operation." Mr. Echo-Hawk has exercised his rights as a member of the public to monitor and report improper activities near his home, but has never vandalized Crown's equipment, disrupted the company's operations, or done anything illegal. Nevertheless, the Payne County deputies

4

were instructed to "detain him" if Mr. Echo-Hawk "showed up" at the site.  Neither Crown nor Payne County obtained approval from the Nation before dispatching the deputies on Indian trust property; and county law enforcement officers have no authority to detain or arrest Indians on Pawnee land under tribal jurisdiction.

12.    Defendant BIA is an agency of the United States within the Department of the Interior. BIA is responsible for approving and administering leases of Indian minerals.  BIA serves as trustee of the Pawnee Nation and its members with a fiduciary duty to act in their best interest. The agency must meaningfully consult with them before making any decision that affects their trust property and resources, including water and oil and gas resources.

13.    Defendant BLM is an agency of the United States within the Department of the Interior. BLM is responsible for approving drilling permits and other licenses to conduct oil and gas development on Indian leases.  BLM serves as trustee of the Pawnee Nation and its members with a fiduciary duty to act in their best interest.  The agency must meaningfully consult with them before making any decision that affects their trust property and resources, including water and oil and gas resources.

14.    Defendant Sally Jewell is named in her official capacity as the Secretary of the United States Department of the Interior.  Secretary Jewell has oversight and authority over the actions of both BLM and BIA.  She has trust responsibilities to the Pawnee Nation and its members with a fiduciary duty to act in their best interest.

**LEGAL FRAMEWORK**

**A.      Leasing and Development of Indian Minerals**

15.      Under 25 U.S.C. § 396, Indian allotment lands may be leased for mineral development.[2] While the Indian allotment owners are parties to the lease, BIA administers the leasing process under a comprehensive statutory and regulatory framework.  Section 396 provides that leasing may occur as "deemed advisable by [BIA]; and the [agency] is authorized to perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section."  25 U.S.C. § 396; see also 25 C.F.R. § 212.20 (BIA leasing regulations).  Leases must be approved by BIA, 25 C.F.R. § 212.20(c), and BIA "shall have the right to reject all bids whenever in [its] judgment the interests of the Indians will be served by so doing."  25 U.S.C. § 396.  Congress has dictated that BIA can approve leases in many cases with consent from only a bare majority of the allotment owners.  25 U.S.C. § 2218(b).  Thus, BIA can approve a lease even where many of the Indian mineral owners oppose it.

16.      Once the leases are issued, BIA and BLM both oversee their development.  BLM reviews and approves applications for permits to drill on the leases.  72 Fed. Reg. 10,328, 10,334 (Mar. 7, 2007) (BLM Onshore Order No. 1).  As part of the approval process, BIA coordinates and approves surface use terms that become part of the permit.  For example, BIA is responsible for

---

[2] Allotments are tribal lands that were allotted to individual tribal members pursuant the General Allotment Act (also known as the Dawes Act) and subsequent statutes.  See Act of Feb. 8, 1887 (24 Stat. 388, ch. 119, 25 U.S.C. § 331 (repealed)) (Dawes Act).  While the individual tribal members hold beneficial title, the allotment is held in trust by the United States for the "benefit of the Indian."  Id. § 5.  Because they are held in trust by the federal government, allotment lands cannot be sold or in any way alienated by the Indian landowner.  Id.  Most of the lands within the Pawnee reservation boundary were allotted by the federal government in the early 1890s.  See Act of March 3, 1893 § 12 (27 Stat. 612, ch. 209).

"mak[ing] access arrangements with the Indian surface owners." See id. at 10,330-331.

Similarly, BIA is responsible for approving rights-of-way for access and surface use terms and

conditions in certain circumstances. Id. at 10,335, 10,337.

**B.      The Administrative Procedure Act (APA)**

17.      Plaintiffs bring the claims in this case under the APA because the laws giving rise to

those claims do not include a citizen suit provision. The APA allows persons and organizations

to appeal final agency actions to the federal courts. 5 U.S.C. §§ 702, 704. The APA declares

that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

**C.      The National Environmental Policy Act (NEPA)**

18.      Congress enacted NEPA to, among other things, "encourage productive and enjoyable

harmony between man and his environment" and to promote efforts "that will prevent or

eliminate damage to the environment." 42 U.S.C. § 4321.

19.      NEPA requires all federal agencies, including BIA and BLM, to take a hard look at the

environmental consequences of their proposed actions. 42 U.S.C. § 4332(2)(C). In doing so, an

agency must identify and disclose these impacts to the public. 40 C.F.R. § 1502.1. NEPA

requires agencies to analyze and disclose to the public all "reasonably foreseeable" impacts of a

proposed action. See 40 C.F.R. §§ 1508.8, 1502.16.

20.      NEPA serves two goals. First, by requiring the agency to consider environmental

impacts in advance, "NEPA ensures that important effects will not be overlooked or

underestimated only to be discovered after resources have been committed or the die otherwise

cast." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). Second, NEPA

requires "broad dissemination of relevant environmental information" so that the public can comment on and effectively participate in agency decision making. Id. at 349-50.

21.    If an action "may" have a significant impact on the environment, NEPA requires the agency to prepare an environmental impact statement (EIS). 40 C.F.R. § 1508.18; see also, 42 U.S.C. § 4332(2)(C). Where the impacts of a project are not significant, or the agency is uncertain about their significance, it may prepare a shorter analysis called an environmental assessment (EA). 40 C.F.R. §§ 1501.3, 1508.9.

22.    In certain limited circumstances, an agency can use a "categorical exclusion" (CX) rather than preparing an EA or EIS. 40 C.F.R. § 1501.4(a)(2). A CX covers a category of actions that the agency has determined in advance by rule or policy will not "'individually or cumulatively have a significant effect on the human environment.'" Utah Envtl. Cong. v. Bosworth, 443 F.3d 732, 736 (10th Cir. 2006) (quoting 40 C.F.R. § 1508.4).

**D.    The  American Indian Agricultural Resource Management Act Of 1993 (AIARMA)**

23.    AIARMA imposes a mandate for BLM and BIA to follow tribal laws. It requires that "[u]nless otherwise prohibited by Federal law, the Secretary [of Interior] shall comply with tribal laws and ordinances pertaining to Indian agricultural lands, including laws regulating the environment and historic or cultural preservation, and laws or ordinances adopted by the tribal government to regulate land use or other activities under tribal jurisdiction." 25 U.S.C § 3712(b). Another provision of the statute requires that Interior "shall conduct all land management activities on Indian agricultural land . . . in accordance with all tribal laws and ordinances, except in specific instances where such compliance would be contrary to the trust responsibility of the United States." Id. § 3712(a).

24.    AIARMA also authorizes BIA and Indian tribes to develop ten-year plans for "the management of Indian agricultural lands." 25 U.S.C. § 3711(a), (b). These plans, known as Agricultural Resource Management Plans (ARMPs), are binding on the federal government. When approved by BIA, an ARMP "shall govern the management and administration of Indian agricultural resources and Indian agricultural lands by the Bureau and the Indian tribal government." 25 U.S.C. § 3711(b)(2). The statute also requires that the Interior Department "shall conduct all land management activities on Indian agricultural land in accordance with goals and objectives set forth in the approved agricultural resource management plan . . . except in specific instances where such compliance would be contrary to the trust responsibility of the United States." Id. § 3712(a).

**E.    The National Historic Preservation Act (NHPA)**

25.    The National Historic Preservation Act (NHPA) requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of that "undertaking" on historic properties. 54 U.S.C. § 306108; 36 C.F.R. § 800.1(c).

26.    The NHPA defines an undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . (3) those requiring a Federal permit, license, or approval." 54 U.S.C. § 300320; see also 36 C.F.R. § 800.16(y) (same). Federal approval of an oil and gas lease or drilling permit constitutes an undertaking requiring prior compliance with Section 106 of the NHPA.

27.    The Section 106 process requires federal agencies to: "make a reasonable and good faith effort" to identify historic properties in the area, 36 C.F.R. § 800.4(b)(1); evaluate the eligibility of historic properties for the National Register, id. § 800.4(c); assess any effects the undertaking may have on historic properties, id. § 800.5; and if the effects are adverse, develop and evaluate

alternatives or modifications to the project to avoid, minimize, or mitigate those effects based on consultation with the state historic preservation office, Indian tribes, the Advisory Council on Historic Preservation, and other consulting parties, id. § 800.6(a).  These steps must be completed prior to approval of an undertaking.

**F.      Executive Order 11988**

28.      Executive Order 11988 requires federal agencies to "avoid to the extent possible" development in floodplains.  Exec. Order 11988, 42 Fed. Reg. 26,951 (May 24, 1977).  It directs that "[b]efore taking an action, each agency shall determine whether the proposed action will occur in a floodplain."  Id. § 2(a)(1).  This determination is typically done in the agency's NEPA analysis.  See id.  If a proposed action would be located in a floodplain, the agency must "consider alternatives to avoid adverse effects and incompatible development in the floodplains." Id. § 2(a)(2).

29.      An agency may proceed with an action in a floodplain if it determines that the "only practicable alternative . . . requires siting" it there.  Id.  The agency, however, must: (a) "design or modify its action in order to minimize potential harm" to the floodplain, and (b) "prepare and circulate a notice containing an explanation" of why the action is being located in the floodplain. Id.

**G.      The Trust Responsibility**

30.      The federal government and its agencies, including Secretary Jewell, BIA, and BLM, have a trust obligation that requires the government to act in the best interest of Indian tribes and their members.  See U.S. v. Mitchell, 463 U.S. 206, 225-26 (1983).  The federal government violates this trust obligation when it fails to comply with an applicable statute or regulation.  See, e.g., Ogalala Sioux Tribe v. Andrus, 603 F. 2d 707, 721 (8th Cir. 1979); Nez Perce Tribe v. U.S.

Forest Serv., 2013 WL 5592765, *2 (D. Idaho Oct. 10, 2013).

31.     The trust obligation also requires federal agencies like BLM and BIA to consult with a tribe when an agency decision may have adverse impacts on tribal resources.  Executive Order 13175 directs federal agencies to "establish regular and meaningful consultation and collaboration" with tribal officials when developing policies or actions that affect a tribe.  Exec. Order No. 13175, 65 Fed. Reg. 67,249 (Nov. 6, 2000).  The Order recognizes that "Indian tribes exercise inherent sovereign powers over their members and territory.  The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, tribal trust resources, and Indian tribal treaty and other rights."  Id. § 2(b).

32.     The Department of Interior Manual directs that agencies should "consult with tribes on a government-to-government basis whenever plans or actions affect tribal trust resources, trust assets, or tribal health and safety."  512 DM 2 § 2.  The manual states that agencies should begin consultation "as early as possible when considering" an action, and provide the Indian tribe with "a meaningful opportunity to participate" in the process.  512 DM 5 § 5.5.

33.     The Interior Department Manual provides that merely "[p]roviding notification" of an action "is not consultation."  Id.  Instead, the agency should generally provide the tribe with at least 30 days advance notice of consultation and provide "sufficient detail of the topic" to allow the tribe "to fully engage in the consultation."  Id.  The tribe also should be given an opportunity to request technical assistance and provide feedback prior to the consultation.  Id.

11

**STATEMENT OF FACTS**

**A.    Background**

34.    Hydraulic fracturing is a technique in which water, chemicals, and sand are injected through an oil and gas well into geologic formations under high pressure to fracture the rock and thereby release oil and gas.  While such techniques have existed for decades, their intensity, scale and complexity have increased dramatically in recent years.  Companies today combine hydraulic fracturing with advanced horizontal drilling technologies to construct wellbores that are nearly three miles long and use millions of gallons of water per well.  Much of that water returns to the surface (along with chemicals, salts, and other materials) as waste that must be disposed.  The surface disturbance, traffic, noise, air pollution, and accidents associated with modern hydraulic fracturing far exceed the impacts from older, conventional development.

35.    Modern hydraulic fracturing operations also cause earthquakes.  Companies pump enormous volumes of hydraulic fracturing wastewater into underground injection wells for disposal.  The subsurface pressures from that injected waste have caused a wave of disposal-induced earthquakes in northern Oklahoma.  By 2015, Oklahoma had surpassed California as the most seismically-active state in the country.  Moreover, the leases and permits at issue in this case lie only five miles from the Town of Cushing, where a major oil and gas pipeline and storage hub (with tanks holding 50 million barrels of oil) is located.  Earthquakes around Cushing have raised concerns among geologists about the safety of the tank farm and other infrastructure at the Cushing hub.[3]

---

[3] See D. E. McNamara et al., Reactivated faulting near Cushing Oklahoma: increased potential for a triggered earthquake in an area of United States strategic infrastructure (American Geophysical Union 2015), available at: http://earthquakes.ok.gov/wp-content/uploads/2015/04/McNamara_et_al-2015-Geophysical_Research_Letters.pdf (accessed Nov. 16, 2016).

36.     Crown operates at least five disposal wells in close proximity to the Nation and Mr. Echo-Hawk's home.  Some of these wells inject fracturing wastes into the same geologic formation (the Arbuckle formation) that has been linked to induced earthquakes.  The Oklahoma Corporation Commission has identified several Crown disposal wells as contributing to induced earthquakes.

37.     Recognizing the risks associated with modern hydraulic fracturing, the Pawnee Nation in October 2015 passed a moratorium on leasing and fracturing approvals on Indian land in Payne and Pawnee Counties (the Moratorium).  The tribal resolution adopting the Moratorium described hydraulic fracturing as a "new, vastly different, and highly destructive land use" posing threats of earthquakes, water pollution, and impacts to Indian water rights.  The Moratorium called for BIA and BLM to halt leasing and permitting until the agencies and the Nation can develop a policy to address these concerns.

38.     The Nation's fears about hydraulic fracturing were realized in early September 2016, when the largest earthquake recorded in Oklahoma history (magnitude 5.8) struck the Pawnee area.  The earthquake damaged many of the Nation's administrative buildings and Mr. Echo-Hawk's home.  It also caused structural damage to the homes of other tribal members that is still being assessed.   The Oklahoma Corporation Commission and the United States Environmental Protection Agency have linked the earthquake to several dozen injection wells in the area that were used to dispose of fracturing wastes.

39.     Despite the concerns about modern hydraulic fracturing and the Nation's Moratorium, BLM and BIA have approved new operations on Indian land in violation of federal and tribal laws.

13

**B.    BIA Approved Leases In 2013 Without Any NEPA Analysis Or Consultation.**

40.    The Pawnee Nation is a largely agricultural community.  Lands in the area are used for grazing cattle and growing crops such as corn and alfalfa.  The Cimarron River runs along the southern boundary of the Pawnee Nation and supports a native fishery that is protected under tribal law.  The Nation and its Indian landowners have vested federally-reserved water rights in the river that arise under federal and tribal law.  Those water rights support current and future uses by Mr. Echo-Hawk and other members of the Pawnee Nation for domestic, agricultural, and other purposes on Indian lands.

41.    In 2013, BIA approved at least 17 oil and gas leases on Indian allotments in the Cimarron River Valley within the Pawnee Nation (the Pawnee leases).[4]  BIA's approval of a lease on an Indian allotment represents a federal action subject to NEPA.  See Davis v. Morton, 469 F.2d 593, 596-97 (10th Cir. 1972).  But BIA approved all of the leases without conducting any NEPA analysis.  Instead, the agency treated its lease approval as categorically excluded from NEPA.  This was contrary to law because no categorical exclusion covers approval of a new oil and gas lease.  Instead, BIA leasing regulations require the agency to "ensure that all environmental studies are prepared as required by [NEPA]."  25 C.F.R. §§ 211.7(a), 212.7.

42.    BIA used a CX to approve the Pawnee leases in 2013 despite the issuance of a 2012 Interior Department Inspector General report criticizing that practice.[5]  The Inspector General report observed that BIA's use of CXs to approve oil and gas leases does not comply with

---

[4] BIA leases 14-20-207-12624, 14-20-207-12625, 14-20-207-12626, 14-20-207-12627, 14-20-207-12644, 14-20-207-12645, 14-20-207-12646, 14-20-207-12647, 14-20-207-12648, 14-20-207-12649, 14-20-207-12650, 14-20-207-12651, 14-20-207-12652, 14-20-207-12653, 14-20-207-12654,  14-20-207-12655, 14-20-207-12656.

[5] DOI Office of Inspector General, Oil And Gas Leasing In Indian Country: An Opportunity For Economic Development (Sept. 2012) at 7-9, available at: https://www.doioig.gov/sites/doioig.gov/files/CR-EV-BIA-0001-2011Public.pdf (accessed Nov. 16, 2016).

14

applicable regulations or the purpose of NEPA.

43.     Because BIA failed to analyze the leases under NEPA, it never considered the reasonably foreseeable impacts of developing those leases, such as the effects of hydraulic fracturing and wastewater disposal.  BIA also provided no opportunity for public comment.  The agency did not inform Plaintiffs of potential environmental impacts such as water depletions, potential spills and groundwater contamination, air pollution, and earthquakes.

44.     BIA also did not complete NHPA Section 106 consultation prior to approving the Pawnee leases.

45.     BIA did not engage in government-to-government consultation with the Nation – or even give the Nation notice – prior to approving the Pawnee leases.

**C.      BLM Failed To Comply With The Law When Approving Drilling Permits.**

46.     On March 30, 2015, the company holding the Pawnee leases, Crown, filed five applications for permits to drill (APDs) on four leases, which would be reached by drilling horizontally from a single well pad.[6]  Crown proposed to drill on farmland held in an Indian allotment owned by Mr. Echo-Hawk and other individuals.  Less than three months later, on June 29, 2015, BLM issued a Decision Record, EA and Finding of No Significant Impact (FONSI) approving that drilling.  BLM never circulated a draft of the EA for public review and comment. Nor did BLM give notice or consult with the Nation or Mr. Echo-Hawk about the APDs pursuant to its trust obligation and Interior Department policies.  Instead, BLM approved the drilling permits without the knowledge and consent of the Indian land owners.

---

[6] The permits cover development on Pawnee leases 14-20-207-12624 and 14-20-207-12625, as well as two older Indian leases also held by Crown, BIA lease 14-20-207-1084 and BIA lease 965.

47.    NEPA requires agencies to analyze and disclose to the public all "reasonably foreseeable" impacts of a proposed action.  See 40 C.F.R. §§ 1508.8, 1502.16.  BLM's EA fails to do so.  For example, Crown proposed to construct its well pad only 550 feet from the Cimarron River.  But the EA does not discuss the impacts of Crown's operations on the river, or even acknowledge the potential for a drilling-related spill to contaminate the river.  Instead, the EA inaccurately states that there are no significant water bodies in the vicinity of the well pad.

48.    Crown located its well pad in the Cimarron River floodplain.  But the EA states incorrectly that no floodplains are present in the area.  As a result, the EA does not address whether approval of the well pad complies with Executive Order 11988, the federal mandate protecting floodplains.  This silence violates NEPA regulations.  See 40 C.F.R. § 1502.16(c) (analysis must address "possible conflicts between the proposed action and the objectives of . . . [federal and other] land use plans, policies and controls for the area concerned"); id. §1502.2(d) (similar).  It also fails to comply with Executive Order 11988, which requires the NEPA analysis to consider alternatives that avoid or minimize impacts to the floodplain.

49.    BLM also failed to consider whether Crown's proposed operations complied with Pawnee tribal law.  For example, the location of Crown's well pad violates a Pawnee law requiring that such operations be located no less than 1,000 feet from the river.  Pawnee Nation Natural Resource Protection Act § 415, Tit. XII of Law and Order Code.  BLM does not mention this legal violation, and the EA's silence violates NEPA.  40 C.F.R. §§ 1502.2(d), 1502.16(c).

50.    BLM also failed to address the impacts of Crown's operations on Cimarron River flows and Indian water rights.  The EA incorrectly states that water used for the company's drilling and hydraulic fracturing operations will come from "an existing private surface pond."  In reality, Crown planned to use the Cimarron River for its water supply.  In the vicinity of the Pawnee

leases, Crown obtained approvals from the Oklahoma Water Resource Board in 2015 to divert a total of more than 32 million gallons (99 acre-feet) of water, including 1.6 million gallons (five acre-feet) from the Cimarron River specifically for this drilling project.  This water use pattern continues to the present date.  Crown has not obtained any approvals from the Pawnee Nation for its water uses on Indian lands.  BLM's EA does not analyze or disclose how those withdrawals will impact the river, the water rights held by Plaintiffs and their members, or tribal law governing water use on Indian lands.

51.     Following BLM's June 2015 decision notice approving the five wells, the agency issued two drilling permits and Crown has drilled both wells.  Plaintiffs complained when they observed the company pumping large volumes of water from the Cimarron River for its operations.  In response to those complaints, BIA cited Crown multiple times for improper water diversions, and has described the company as having a "history of negligence on surrounding Indian lands."  BLM, however, let the company continue pumping from the Cimarron River and using that water on Indian land under state water permits.  Rather than requiring Crown to halt the practice, BLM ratified its water use in January and August 2016 using a one-page form called a "sundry notice."  In doing so, BLM did not analyze any of the impacts from that pumping and Crown's water use on Indian land under color of state law.  This failure violated NEPA.  Nor did BLM consult with the Nation or any Indian land owners before issuing the sundry notices.  That failure violated the agency's trust obligation to consult with the Tribe before taking actions affecting tribal natural resources.

52.     The EA also violated NEPA by failing to analyze and disclose the cumulative impacts of Crown's operations.  A cumulative impacts discussion serves to put the environmental impacts of a proposal into context: "cumulative impacts" are the "incremental impact" of the proposed

activity "when added to other past, present and reasonably foreseeable future" actions by other entities in the area. 40 C.F.R. § 1508.7; see also id. § 1508.25.

53.     In the EA, BLM attempted to rely on a 1994 EIS as a "proxy" for analyzing cumulative impacts from the Crown operations. The 21-year-old EIS, however, was outdated and analyzed the development of federal, rather than Indian, minerals. It was arbitrary and capricious to misuse the 1994 NEPA document as a substitute for considering the cumulative impacts of the Crown operations.

54.     Further, BLM completely ignored the problem of earthquakes caused by disposal of hydraulic fracturing wastes. Disposal-induced earthquakes are a significant and reasonably foreseeable environmental impact associated with oil and gas development in Oklahoma. The EA, however, did not address Crown's contribution to that problem. That contribution must be addressed in the EA's cumulative impact discussion because Crown's operations and waste disposal have an "incremental impact" on earthquake risks "when added to other past, present and reasonably foreseeable future" disposals by other companies in the area. 40 C.F.R. § 1508.7; see also, id. § 1508.25. As the NEPA regulations note, "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. The failure to address earthquakes also violated NEPA's requirement to consider the indirect impacts of Crown's drilling operations. See 40 C.F.R. § 1502.16(b). Indirect impacts are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." Id. § 1508.8. Moreover, the BLM EA fails to discuss how the safety of Crown's operations, including pipeline operations, and groundwater at the drilling site, could be impacted by earthquakes.

55.     BLM and BIA also have approved other drilling permits on the Pawnee leases, including but not limited to Crown wells Gertie 1-33MH, Gertie 2-33MH, and Gertie 3-33MH.  On information and belief, those permit approvals suffer from the same legal defects and patterns of water use as five Crown permits addressed above.

**D.     BLM And BIA Failed To Comply With The AIARMA.**

56.     The Pawnee leases approved by BIA, and the Crown drilling permits approved by BLM, cover Indian-owned land used for agriculture and grazing that is subject to the requirements of the AIARMA.  See 25 U.S.C. § 3703(1) (defining "Indian agricultural land").

57.     The lease and drilling permit approvals, however, violated the AIARMA.  First, they fail to comply with Pawnee law in several respects.  For example, locating a Crown well pad only 550 feet from the Cimarron River violates a Pawnee law requiring that it be at least 1,000 feet from the river.  In addition, one of the two Crown drilling permits for that well pad was issued by BLM after October 2015, which conflicted with the Pawnee Moratorium.  On information and belief, BIA also allowed Crown Energy Company to assign or transfer certain leases to another Crown entity after October 2015, which conflicted with the Moratorium.

58.     Moreover, the leases and drilling permit approvals violate the governing ARMP for Pawnee lands.  The ARMP, which BIA approved in 2010, covers oil and gas operations because when "oil and gas locations are placed within existing crop fields, constructed on pasture land, or near water resources" they can "result in extensive impairment to the agricultural uses of the land." ARMP ¶¶ 6.0, 6.1.

59.     The ARMP directs that that "[a]ll land use and mineral leases and permits issued by the federal government require[] compliance with Pawnee Nation Laws and Regulations."  Id. ¶ 6.1. Neither the Crown drilling permits, nor the 2013 Pawnee leases, do so.  For example, they do not

19

comply with the required 1,000-foot setback from the Cimarron River.  Nor do the Pawnee leases or drilling permits mandate compliance with other Pawnee laws, such as the requirement to obtain tribal drilling and water use approvals.  See, e.g., Pawnee Nation Natural Resource Protection Act §§ 408(a)(1) (water use), 411 (maintain in-stream flows), 415 (oil and gas operations), Tit. XII of Law and Order Code.

60.    The ARMP also requires that:

- BIA and the Nation will meet with BLM and oil and gas companies to "discuss proposed surface stipulations for all proposed drilling sites."  It requires that a variety of issues such as water use and waste disposal will be "agreed upon prior to the acceptance of the Application for Permit to Drill (APD) [and] incorporated into the APD before it is approved."

- The oil and gas company "is required to contact the [Nation] prior to starting excavation of a new site."

- For proposed surface use stipulations, the Pawnee will attach applicable conditions required under tribal law.

Id. ¶ 6.0.

61.    Defendants violated these requirements when approving the five Crown drilling permits discussed above.  BIA and BLM never consulted with the Nation about Crown's drilling permit applications.  Instead, BIA met with Crown representatives—and without the Nation or Indian owners—on January 8, 2015 to discuss what surface stipulations should be included in the drilling permits.  The agency's documentation from that meeting makes no reference to tribal law, such as the required 1,000-foot setback from the Cimarron River.  BIA then approved the incorporation of its standard stipulations into the Crown drilling permits.  BIA's meeting with Crown to consult and approve surface stipulations, without including representatives of the Nation, violated the ARMP.  See ARMP ¶ 6.0.

62.    On information and belief, BLM and BIA have approved other drilling permits on the

Pawnee leases, including but not limited to Crown wells Gertie 1-33MH, Gertie 2-33MH, and Gertie 3-33MH, that violated AIARMA for reasons similar to the five Crown permits addressed above.

**FIRST CAUSE OF ACTION**
**(NEPA Violations: Approval of Mineral Leases)**

63.     The allegations in all previous paragraphs are incorporated by reference.

64.     NEPA requires federal agencies, including BIA, to take a hard look at the environmental consequences of proposed federal actions.

65.     When BIA approved the Pawnee leases, it did not conduct any NEPA analysis of those leases.

66.     BIA's approvals of the Pawnee leases was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION**
**(NEPA Violation: Approval of Drilling Permits)**

67.     The allegations in all previous paragraphs are incorporated by reference.

68.     BLM violated NEPA by approving drilling permits on the Pawnee leases without analyzing and disclosing the reasonably foreseeable impacts from that oil and gas development.

69.     BLM violated NEPA by approving sundry notices allowing Crown to pump water from the Cimarron River without analyzing and disclosing the reasonably foreseeable impacts from those diversions.

70.     BLM's approval of the permits and sundry notices was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
**(Failure to Comply with Executive Order 11988)**

71.     The allegations in all previous paragraphs are incorporated by reference.

21

72. Crown's operations are located in the Cimarron River floodplain. But in approving the five Crown drilling permits, BLM failed to acknowledge the floodplain and explain why it was authorizing Crown to operate there. The agency also failed to consider alternatives that could have avoided the floodplain and/or minimized potential harm to the floodplain. These failures violated Executive Order 11988.

73. BLM's approval of the five permits was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION
### (Violations of AIARMA)

74. The allegations in all previous paragraphs are incorporated by reference.

75. BIA's approval of the Pawnee leases, and any transfers or assignments of those leases, failed to require compliance with Pawnee laws and regulations.

76. The approval of drilling permits and sundry notices on the Pawnee leases failed to require compliance with Pawnee laws and regulations and violated the ARMP governing Pawnee lands.

77. As a result, the drilling permit and sundry notice approvals, and the Pawnee lease approvals, transfers and assignments, violated the AIARMA.

78. The drilling permit and sundry notice approvals, and the Pawnee lease approvals, transfers and assignments, were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION
### (Violation of NHPA)

79. The allegations in all previous paragraphs are incorporated by reference.

80. BIA's failure to complete Section 106 consultation prior to approving the Pawnee leases, and drilling permits on those leases, violated the NHPA.

81.     BIA's approval of the Pawnee leases and drilling permits was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### SIXTH CAUSE OF ACTION
### (Failure to Comply with Trust Responsibilities)

82.     The allegations in all previous paragraphs are incorporated by reference.

83.     In approving the Pawnee leases, any transfers or assignments of those leases, and drilling permits and sundry notices on those leases, BIA and BLM failed to comply with their trust obligations to the Nation.  By violating NEPA, Executive Order 11988, NHPA and the AIARMA, the agencies did not meet their trust responsibilities.

84.     In addition, BIA and BLM failed to engage in meaningful government-to-government consultation with the Nation, even though the approval, transfer and assignment of leases, and the approval of drilling permits and sundry notices, affected tribal and allottee resources held in trust, and implicated tribal sovereignty and regulation of natural resources under the Nation's jurisdiction.  The failure to meaningfully consult with the Nation violated the agencies' trust obligations.

85.     The approvals of the Pawnee leases and assignment or transfer of those leases, as well as approvals of permits and sundry notices on those leases, was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.     Declare that BIA's approval of the Pawnee leases violated NEPA;

2.     Declare that the approval of drilling permits and sundry notices on the Pawnee leases violated NEPA;

3.     Declare that the approval of the Crown drilling permits violated Executive Order 11988;

4.      Declare that the drilling permit approvals, sundry notice approvals, and lease approvals, transfers and assignments, violated the AIARMA;

5.      Declare that the approvals of the Pawnee leases and drilling permits on those leases violated the NHPA;

6.      Declare that the approvals and assignments or transfers of the Pawnee leases, and the approvals of drilling permits and sundry notices on those leases, violated the federal government's trust responsibility to the Nation;

7.      Set aside the Pawnee leases as void;

8.      Set aside the approval of all drilling permits and sundry notices on the Pawnee leases;

9.      Enjoin BIA and BLM from approving any activities on the Pawnee leases until the agencies comply with NEPA, Executive Order 11988, the AIARMA, the NHPA, and their trust responsibilities;

10.     Award Plaintiffs their costs and reasonable attorneys' fees; and

11.     Provide such other relief as the Court deems just and proper.


        Respectfully submitted November 18, 2016.


                                s/ Don Mason_____
                                Don Mason, Bar No. 19167
                                dmason@pawneenation.org
                                Attorney General
                                Pawnee Nation of Oklahoma
                                P.O. Box 470,
                                Pawnee, OK  74058
                                Telephone: (918) 762- 3621

                                *Attorney for Plaintiff Pawnee Nation of Oklahoma*

Michael S. Freeman *(Pro Hac Vice Pending)*
mfreeman@earthjustice.org
Earthjustice
633 17th Street, # 1600
Denver, CO  80202
Telephone:  (303) 996-9615

*Attorney for Plaintiffs Pawnee Nation of Oklahoma and Walter R. Echo-Hawk*