UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PAWNEE NATION<br>OF OKLAHOMA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DOUG BURGUM,<br>*in his official capacity as Secretary of the United States Department of the Interior*, et al.,<br><br>Defendants. | ) | No. 4:16-cv-00697-JAW-JFJ |

**ORDER ON ADMINISTRATIVE APPEAL**

The Pawnee Nation of Oklahoma and eleven individual members challenge federal agency approvals of oil and gas drilling permits on Pawnee land in the Cimarron River Valley, which they claim violate various federal laws. The federal agencies argue that several of the Nation's challenges are moot and that the remaining claims are without merit. The court concludes the Nation's challenges are not moot and reaches the merits of each challenge. On review of the available evidence in the administrative record, the court concludes several of the agencies' final actions violated federal law and therefore orders those actions be set aside as unlawful. The court, however, does not reach the Nation's breach of trust duty claim because the court already dismissed that claim.

# I. BACKGROUND

## A. Procedural History

On November 18, 2016, the Pawnee Nation of Oklahoma and eleven individual members of the Pawnee Nation[1] (collectively, the Pawnee) filed a complaint challenging federal agency approvals of oil and gas leases and drilling permits on Pawnee land in the Cimarron River Valley. *Compl.* (ECF No. 2); *First Am. Compl.* (ECF No. 12) (*Am. Compl.*). The Pawnee brought these claims against the Bureau of Indian Affairs (BIA), the Bureau of Land Management (BLM), and Kevin Haugrud in his official capacity as the then Acting Secretary of the United States Department of the Interior (collectively, the Agencies). *Am. Compl.* ¶¶ 22-24.[2]

In their complaint, the Pawnee specifically challenge the Agencies' decisions (1) to approve seventeen oil and gas leases on Pawnee Nation land, (2) to approve Crown Energy Company's drilling permit applications on the leased land, and (3) to approve use and disposal requests by Crown Energy Company related to water for certain drilled wells issued in the form of Sundry Notices. *Am. Compl.* ¶¶ 44-72. The Pawnee allege the Agencies, in approving those leases, drilling permit applications, and sundry notices, failed to comply with the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), Executive Order 11,988

---

[1] Walter R. Echo-Hawk, Lance Echo-Hawk, Bernadette Echo-Hawk, Alvin George Echo-Hawk, George T. Echo-Hawk, David D. Echo-Hawk, Helen Norris, Helaire Echo-Hawk, Howard Echo-Hawk, Holly Echo-Hawk, and Debra Echo-Hawk are each members of the Pawnee Nation of Oklahoma, a federally-recognized Indian tribe, and partial owners of Pawnee Indian allotments affected by the federal oil and gas approvals challenged in their complaint. *First Am. Compl.* ¶¶ 7-21 (ECF No. 12).

[2] Pursuant to Rule 25(d), the Court substitutes Secretary of the Interior Doug Burgum as defendant for former Acting Secretary of the Interior Kevin Haugrud. *See* FED. R. CIV. P. 25(d).

(E.O. 11988), the American Indian Agricultural Resource Management Act of 1993 (AIARMA), and breached trust obligations to the Pawnee Nation. *Id.* ¶¶ 73-95. The Pawnee urge the Court to set aside the Agencies' decisions pursuant to § 706(2)(A) of the Administrative Procedure Act (APA). *Id.*

On March 3, 2017, the Agencies filed an answer. *Answer to Pls.' First Am. Compl.* (ECF No. 13). On May 15, 2017, the Agencies filed a motion to dismiss some of the Pawnee's claims. *Fed. Resp'ts' Mot. to Dismiss* (ECF No. 19).

On September 14, 2017, the Court granted the Agencies' partial motion to dismiss, and dismissed the Pawnee's claims challenging the lease approvals, the AIARMA claim in its entirety, and the breach of trust claim. *Opinion and Order* (ECF No. 27) (*Partial Dismissal Order*). The Court's partial dismissal order narrowed the Pawnee's claims to their request to set aside the Agencies' approval of the drilling permit applications and the sundry notices for violations of NEPA, NHPA, and E.O. 11988. *Id.*; *Am. Compl.* ¶¶ 77-83, 89-95.

After the Court's partial dismissal order, the parties engaged in significant litigation regarding the contents of the administrative record. *See Pls.' Mot. to Complete Admin. R.* (ECF No. 35); *Resp. to Pls.' Mot. to Complete the Admin. R.* (ECF No. 38); *Pls.' Reply in Supp. of Mot. to Complete the Admin. R.* (ECF No. 43); *Min. Sheet* (ECF No. 48) (granting in part and taking under advisement in part the Pawnee's motion to complete the administrative record); *Min. Sheet* (ECF No. 54) (denying the remaining request discovery without prejudice to refiling and granting in part the Pawnee's alternative request for limited discovery); *Fed. Defs.' Objs. to the*

*Magistrate's Order Granting Disc. Related to Pls.' Mot. to Complete the Admin. R.* (ECF No. 62); *Pls.' Resp. to Defs.' Objs. to Magistrate Order on Disc.* (ECF No. 65); *Fed. Defs.' Reply in Supp. of Objs. to Magistrate's Order Granting Disc. Related to Pls.' Mot. to Complete the Admin. R.* (ECF No. 67); *Min. Order* (ECF No. 68) (overruling objection and granting in part and denying in part the Pawnee's motion to complete the administrative record). On August 28, 2019, the Agencies filed a notice of lodging the administrative record, which the Agencies later resubmitted on October 6, 2021. *Notice of Lodging Admin. R.* (ECF No. 79); *Conventional Filing of the Admin. R.* (ECF No. 94); *Conventional Filing of the Admin. R.* (ECF No. 95).

Meanwhile, On May 30, 2019, pursuant to the briefing schedule, the Pawnee filed a merits brief on their remaining claims. *Pls.' Opening Merits Brief* (ECF No. 71) (*Pls.' Brief*). On July 26, 2019, the Agencies filed their brief in opposition and motion to strike extra-record materials attached as exhibits to the Pawnee's merits brief. *Defs.' Resp. Brief* (ECF No. 72) (*Defs.' Opp'n*); *Mot. to Strike Extra-R. Materials Submitted with Pls.' Opening Merits Brief* (ECF No. 73) (*Defs.' Mot. to Strike*). On August 28, 2019, the Pawnee filed their reply. *Pls.' Reply Brief on the Merits* (ECF No. 78) (*Pls.' Reply*).

After the parties completed briefing on the Agencies' motion to strike extra-record materials, the Court referred the motion to the Magistrate Judge. *Pls.' Resp. in Opp'n to Defs.' Mot. to Strike* (ECF No. 74) (*Opp'n to Mot. to Strike*); *Reply in Supp. of Defs.' Mot. to Strike Extra-R. Materials* (ECF No. 81) (*Defs.' Reply*); *Min. Order* (ECF No. 82). On January 8, 2020, the Magistrate Judge denied the Agencies' motion

to strike, permitting the Pawnee to supplement in part the administrative record with the exhibits attached to its merits brief. *Opinion and Order* (ECF No. 84) (*Order on Mot. to Strike*).

Upon the retirement of the presiding judge, the case was randomly reassigned on January 23, 2020 to United States District Judge Clare V. Eagan, *Min. Order* (ECF No. 86), and later transferred to United States District Judge John F. Heil on June 10, 2020. *Min. Order* (ECF No. 89). On August 12, 2025, this case was reassigned to this Judge. *Min. Order* (ECF No. 100).

### B. Factual Background[3]

#### 1. The Plaintiffs

The Pawnee Nation of Oklahoma is a federally recognized Indian tribe with approximately 3,200 enrolled members. *Pl.s' Brief*, Attach. 1, *Pls.' Decls.* at 1-4. The Pawnee Nation's tribal jurisdiction covers all Indian and tribal trust land within the boundaries of the original Pawnee Indian Reservation in Pawnee County and part of Payne County, Oklahoma, including the lands and waters at issue in this case. *Id.*

---

[3] The Court's cites the administrative record in footnotes. Citations beginning with FR, GERT, DR, TAYLOR or similar prefixes reference the administrative record, and follow the pagination format (i.e., bates numbering) used by the Agencies in that record.

Given the nature of the evidence and the rules governing the production of the administrative record, there are several duplicate documents. For example, because each agency approval of a drilling permit application is a separate final agency action that must be reviewed on its own administrative record, the administrative record citation (bates numbering) for the Environmental Assessment of a given well pad may differ depending on which specific well the permit approval refers (e.g., FR#1-APD-AR-0000002 is the same document as DR9#1-APDAR-0000044). This duplication was unavoidable. Where appropriate in this order, however, the Court has limited its citations for documents that are duplicated in the administrative record for ease of reference and to avoid parallel citations.

The administrative record was produced digitally and may be available at the Court Clerk's Office. *See Notice of Lodging Admin. R.*; *Conventional Filing of the Admin. R.*; *Conventional Filing of the Admin. R.*

The Pawnee Nation tribal government is responsible for protecting the health, safety, and welfare of tribal members and has enacted environmental, conservation, and water laws to discharge those responsibilities. *Pls.' Brief* at 1.

The Pawnee Nation is primarily an agricultural community and the Pawnee lands at issue here are used for grazing cattle and growing crops such as corn and alfalfa. *Pls.' Decls.* at 1. The Cimarron River runs along the southern boundary of the Pawnee Nation and supports a native fishery protected under tribal law. *Id.* at 2. The Pawnee Nation and its Indian landowners also have vested federally-reserved water rights in the Cimarron River that arise under federal and tribal law, and those water rights support current and future uses by the Plaintiffs in this action and other members of the Pawnee Nation for domestic, agricultural, and other purposes on Indian lands. *Id.* The Pawnee Nation is a partial owner of some of the allotments on which the Agencies approved the drilling permits. *Id.* at 1.

The eleven individual plaintiffs are members of the Pawnee Nation who own lands affected by the oil and gas approvals challenged in this case. *Pls.' Brief* at 2. Walter R. Echo-Hawk, Lance Echo-Hawk, Bernadette Echo-Hawk, Alvin George Echo-Hawk, George T. Echo-Hawk, David D. Echo-Hawk, Helen Norris, Helaire Echo-Hawk, Howard Echo-Hawk, Holly Echo-Hawk, and Debra Echo-Hawk are each partial owners of Pawnee Indian allotments affected by the federal oil and gas approvals challenged in this case. *See Pls.' Decls.* at 17-40.[4]

---

[4] Allotments are tribal lands that were allotted to individual tribal members pursuant the General Allotment Act (also known as the Dawes Act) and subsequent statutes. 25 U.S.C. §§ 331-333, *repealed by* Pub. L. 106-462, Title I, § 106(a)(1), 114 Stat. 2007. While the individual tribal members hold beneficial title, the allotment is held in trust by the United States for the "benefit of the Indian."

### 2. The Oil and Gas Drilling Permit Applications and Approvals on Pawnee Nation Land

Between August and November 2013, BIA approved at least 17 oil and gas leases on Indian allotments near the Cimarron River and within Pawnee Nation land. *Pls.' Brief*, Attach. 3, *BIA Decision Letter*.[5] Crown Energy Company (Crown) obtained the rights to those leases and submitted nine applications for drilling permits in 2015. *Pls.' Brief* at 3; *Defs.' Opp'n* at 2. In August 2015 and February 2016, BIA and BLM approved Crown's drilling permit applications, authorizing the company to drill oil and gas wells on those allotments.[6] *Pls.' Brief* at 3 n.4. The nine proposed wells would be drilled on one of three well pads: five on a pad named Francis-Double R9; three on a pad named Gertie; and one on a pad named Taylor.[7] *Id.* at 3. As part of its applications, Crown submitted a "cultural resources inventory" performed by a

*Id.* Because they are held in trust by the federal government, allotment lands cannot be sold or in any way alienated by the Indian landowner. *Id.* Most of the lands within the Pawnee Nation reservation boundary were allotted by the federal government in the early 1890s. *See* Act of Mar. 3, 1893, ch. 209, § 12, 27 Stat. 612.

[5] As explained, the Plaintiffs originally challenged BIA's lease approvals in their complaint, but the Court dismissed those claims in its September 14, 2017 order. *Partial Dismissal Order* at 4-9, 16. On May 24, 2018, on remand to the agency, BIA's regional office ruled that nine of the challenged leases had expired and the Plaintiffs' challenge was therefore moot, the BIA lacked jurisdiction regarding non-trust leases and undivided ownership interests, the Plaintiffs lacked standing to appeal leases covering lands in which they have no ownership interest. *See BIA Decision Letter* at 5. However, for the four leases for which the Plaintiffs had standing, BIA concluded the leases were approved in violation of NEPA. *Id.* The BIA regional office's subsequent review these leases does not affect the Court's merits review of the Plaintiffs' remaining claims in this case.

[6] See FR#1-APD-AR-0000092-93, 95-111 (Francis #1-9 permit); FR-OTHER-APD-AR-0000369-370, 372-388 (Francis #2-9 permit); TAYLOR-APD-AR-0000100-101, 103-107 (Taylor #1-5 permit); DR9-OTHER-APD-AR-0000116-117, 119-136 (Double R #3-4 permit); DR9#1-APD-AR-0000162-163, 165-181 (Double R9 #1-4 permit); DR9-OTHER-APD-AR-0000343-344, 346-362 (Double R9 #2-4 permit); GERT-OTHER-APD-AR-0000119-120, 122-141 (Gertie #1-33 permit); GERT-OTHER-APD-AR-0000410-411, 413-425, 426-427, 428-432 (Gertie #2-33 permit); GERT#3-APD-AR-0000252-253, 255-267, 268-274 (Gertie #3-33 permit).

[7] The Agencies also approved a proposal to drill a tenth well, the Pratt Well, but no permit issued. *Id.*; *see* TAYLOR-APD-AR-0000002.

third-party company for each well site.[8] Each inventory concluded that no historical property would be affected by Crown's planned activities.[9] *Id.*

As part of the Agencies' approval process, BLM issued an environmental assessment (EA) and a finding of no significant impact (FONSI) for each of the three well pads.[10] BLM issued the EAs and FONSIs for the Francis-Double R9 and Gertie well pads on June 24, 2015,[11] and ultimately approved Crown's eight drilling permit applications for the Francis-Double R9 and Gertie wells on August 10 and 11, 2015.[12] BLM issued the EA and FONSI for the Taylor well pad on February 8, 2016, and approved Crown's drilling permit application on February 29, 2016.[13]

### 3. The Sundry Notices

Each EA stated that the water source "for all phases of development would come from an existing private surface pond" and noted that Crown had "a contract with [a] third party operator to purchase water from the private source."[14] However, during operations, Crown used water from the Cimarron River. On December 17,

---

8 FR#1-APD-AR-0000833-874; TAYLOR-APD-AR-0000873-921. The Gertie wells' cultural resources inventory is not at issue.

9 GERT#3-APD-AR-0000098; DR9#1-APD-AR-0000099.

10 DR9#1-APD-AR-0000019-108; GERT#3-APD-AR-0000018-107; TAYLOR-APD-AR-0000002-99.

11 FR#1-APD-AR-0000002-99; DR9#1-APD-AR-0000019-108; GERT#1-APD-AR-0000018-107.

12 FR#1-APD-AR-0000092 (Francis #1); FR-OTHER-APD-AR-0000369 (Francis #2); DR9#1-APD-AR-0000162 (Double R9 #1); DR9-OTHER-APD-AR-0000343 (Double R9 #2); *id.* at 116 (Double R9 #3); GERT-OTHER-APD-AR-0000119 (Gertie #1); *id.* at 410 (Gertie #2); GERT#3-APD-AR-0000252 (Gertie #3).

13 TAYLOR-APD-AR-0000002-99, 100.

14 FR#1-APD-AR-0000020, 52; DR9#1-APD-AR-0000037; GERT#3-APD-AR-0000036, 68; TAYLOR-APD-AR-0000020, 49, 51.

2015, BLM issued a Notice of Written Order for four of the Francis-Double R9 wells stating:

> Violations: Unapproved drilling/completion water source and transport route; failure to identify/notify of change in drilling/completion water source and transportation route as per approved APD/SUPO and COA. Corrective Action: Submit for approval via Sundry Notice Form 3160-5 a revised/updated plan and map that identifies well drilling/completion water source and transportation route/method, along with applicable/required authorizations, permits and approvals.[15]

In August 2016, BLM issued a Notice of Written Order for one of the Gertie wells, which a BLM field manager described as "nearly identical" to the Francis-Double R9 notice.[16] The field manager noted that Crown's paperwork "[i]n both instances . . . identified 'Location and Type of Water Supply' as 'a private source,' and in both cases the water source ended up being the Cimarron River, which is public."[17]

Crown submitted sundry notices for the Francis-Double R9 wells in January 2016 and for the Taylor and Gertie wells in August 2016. Each "request[ed] approval for an alternate route and water source . . . along the Cimarron River" and described "access and use of Cimarron River water to [Crown] for the drilling and completing"

---

15 DR9#1-SUNDRY-CW-0000068 (emphasis supplied).

16 GERT#3-SUNDRY-CW-0000037.

17 *Id.* There is evidence Crown caused wrongful issuance of various permits from the Oklahoma Water Resources Board (OWRB) allowing use of river water, in part by inducing at least one individual to make representations regarding ownership which were not based in fact. DR9#1-SUNDRY-CW-0000203 (BIA letter describing that it "uncovered a series of what [it] hope[d] to only be misunderstandings related to the water take" from the Cimarron River).

of wells.[18] BLM approved the Francis-Double R9 sundry notice in April 2016 and the Gertie sundry notice in August 2016.[19]

Six of the nine approved drilling permit applications expired before Crown began mineral production: Francis #2; Double R9 #2 and #3; Gertie #1 and #2; and Taylor.[20] Three drilling permit applications were in production and active at the time of briefing: Francis #1, Double R9 #1, and Gertie #3.

## II. THE PARTIES' POSITIONS

### A. The Pawnee's Merits Brief

The Pawnee argue that the Agencies' environmental assessments, findings of no significant impact, and drilling permit and sundry approvals violated NEPA, the NHPA, E.O. 11988, and the Government's trust responsibility to the Pawnee Nation and therefore must be set aside as unlawful agency action under the APA. *Pls. Brief* at 25. First, the Pawnee argue that the Agencies' environmental assessments and findings of no significant impact violated NEPA because the Agencies failed to address the impacts of water pollution and withdrawals from the Cimarron River and its floodplain, the impact of drilling on the private residents adjacent to some of the wells, the impacts of oil and gas-related earthquakes, the cumulative impact on the environment from all nine drilling permits. *Id.* at 4-19. Next, they argue the Francis-

[18] DR9#1-SUNDRY-CW-0000065; FR#3-SUNDRY-CW-0000137; GERT#3-SUNDRY-CW-0000064.

[19] *Id.*

[20] FR-OTHER-APD-AR-0000371; DR9-OTHER-APD-AR-0000345; DR9-OTHER-APD-AR-0000118; GERT-OTHER-APD-AR-0000121; GERT-OTHER-APD-AR-0000412; TAYLOR-APD-AR-0000208.

Double R9 drilling permit approvals violated E.O. 11988, because the Agencies approved the drilling permits without addressing the fact that the five wells are located on the Cimmaron River's floodplain. *Id.* at 20-21. The Pawnee argue that the Agencies' approvals for the Francis-Double R9 and Taylor drilling permits violated NHPA Section 106 because the Agencies failed to consult the Pawnee Nation and provide the requisite thirty-day-notice for the Pawnee Nation to review and object to the Agencies' conclusion that the well pads would not impact cultural resources. *Id.* at 21-24. Finally, they argue the Agencies' alleged violations of NEPA, NHPA, and E.O. 11988 constitute a breach of the Government's trust responsibility to the Pawnee Nation. *Id.* at 25.

**B. The Agencies' Brief in Opposition**

The Agencies argue the Pawnee's claims have no merit and therefore must be denied. *Defs.' Opp'n*. First, the Agencies argue the Pawnee's claims regarding the six approved drilling permit applications that expired before Crown undertook any mineral production are moot. *Id.* at 6-7. As for the three remaining drilling permit applications, the Agencies argue BLM properly conducted a NEPA analysis of the potential environmental impacts for the proposed wells, including impacts to water resources, water withdrawals, natural disasters such as earthquakes, and cumulative impacts. *Id.* at 8-20. The Agencies maintain they properly consulted with the Pawnee Nation as required by NHPA. *Id.* at 20-21. The Agencies insist they complied with E.O. 11988 and dispute the Pawnee's assertion that the Francis-Double R9 well is located on a floodplain. *Id.* at 22-23. Finally, the Agencies argue

that the Pawnee have failed to identify a specific statutory duty that would give rise to a claim for breach of trust responsibility. *Id.* at 23-25.

### C. The Pawnee's Reply

In their reply, the Pawnee argue that their claims regarding the six expired drilling permit applications are not moot because the underlying EAs for the three well pads have not expired and thus the Agencies could re-issue the expired permits based on the same flawed NEPA analysis. *Pls' Reply* at 1-3. The Pawnee maintain the Agencies violated NEPA by failing to address the drilling's effect on the Cimarron River and its floodplain, water withdrawals, neighboring residents, the risk of earthquakes, and the drilling's cumulative impacts. *Id.* at 3-12. The Pawnee contend that the Agencies violated E.O. 11988 because the Francis-Double R9 well pad is located on the Cimarron River floodplain and the Agencies' "no floodplain" finding lacks any evidentiary support. *Id.* at 12-14. The Pawnee insist the Agencies violated the NHPA by failing to properly consult with and notify them of the Agencies' proposed findings about the Taylor and Francis-Double R9 wells. *Id.* at 14-15. Finally, the Pawnee argue the Agencies' statutory violations and their failure to consult breached the Agencies' trust duties. *Id.* at 15.

## III. LEGAL STANDARD

Because neither NEPA nor NHPA provides a private right of action, a plaintiff must challenge final agency action taken pursuant to either statute under the APA. *See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1029 (10th Cir. 2023) (*Diné II*); *Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d

831, 839 (10th Cir. 2019) (*Diné I*). Executive Orders similarly do not provide a private right of action, but some Executive Orders, such as E.O. 11988, are treated as agency action and reviewed under the APA. *See Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1018-19 (10th Cir. 2012) (reviewing APA challenge to E.O. 11988).

A court will not overturn an agency's decision "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Utah Env't Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)). An agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Wyoming v. United States Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (internal quotation marks omitted). The challenger "bears the burden of persuasion" to show that the agency action is arbitrary and capricious. *N.M. Health Connections v. Health and Human Servs.*, 946 F.3d 1138, 1162 (10th Cir. 2019).[21]

---

[21] Because the Court is reviewing challenges to agency findings of fact and compliance with procedural rules, rather than agency interpretation of law, the case does not implicate *Loper Bright*. "[W]hen an agency interprets a statute, judicial review of the agency's interpretation is *de novo*." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 179 (2025). Courts "may not defer to an agency interpretation of the law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024); *see 3484, Inc. v. Nat'l Lab. Rels. Bd.*, 137 F.4th 1093, 1103-04 (10th Cir. 2025) (explaining, after *Loper Bright*, "deference is no longer owed" to an agency's interpretation of the law).

## IV. DISCUSSION

### A. Extra-Record Evidence

"Judicial review of agency action is normally restricted to the administrative record." *Citizens For Alts. to Radioactive Dumping v. United States Dep't of Energy*, 485 F.3d 1091, 1096 (10th Cir. 2007) (citation omitted). Courts may permit supplementation and consider extra-record evidence in "extremely limited circumstances." *Id.* Such circumstances generally may include: "(1) the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials; (2) the record is deficient because the agency ignored relevant factors it should have considered in making its decision; (3) the agency considered factors that were left out of the formal record; (4) the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues; and (5) evidence coming into existence after the agency acted demonstrates the actions were right or wrong." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1027 n.1 (10th Cir. 2001) (citing *Am. Min. Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985)). Courts have also recognized that extra-record evidence may be relevant "where there are gaps or inadequacies in the NEPA process." *Rags Over the Arkansas River, Inc. v. Bureau of Land Mgmt.*, No. 1:12-cv-00265-JLK, 2014 U.S. Dist. LEXIS 200039, at *2-3 (D. Colo. Mar. 28, 2014) (referring to this circumstance as the "NEPA exception"). Any exceptions to the presumption of regularity and fullness of the record are narrowly construed, and the party seeking supplementation bears the burden of proving an exception applies. *Id.*

Accompanying their merits brief, the Pawnee submitted three extra-record attachments. The first attachment consists of eleven declarations, three by Pawnee Nation officials and eight by individual tribal members who are partial owners of the affected allotments, detailing various harms from the challenged oil and gas approvals. *See Pls.' Decls.* The second attachment is a declaration from Ava Farouche, an attorney for the Pawnee, describing two maps attached to the declaration, a FEMA map (Exhibit A) and a well location map (Exhibit B). *Pls.' Brief*, Attach. 2, *Farouche Decl.* The third attachment is a May 24, 2018 letter from the BIA to Michael Freeman, counsel for the Pawnee, stating that approval of certain leases that were originally challenged in this litigation did not comply with NEPA and were invalid. *Pls.' Brief*, Attach 3, *Freeman Letter*. On July 26, 2019, along with their brief in opposition, the Agencies filed a motion to strike the first and second attachments as improper supplements to the administrative record.[22] *See Defs.' Mot. to Strike*. The Agencies did not challenge the Freeman Letter.[23]

On January 8, 2020, the Magistrate Judge denied the Agencies' motion to strike, permitting the Pawnee to supplement the administrative record with the exhibits attached to its merits brief. *Order on Mot. to Strike*. First, the Magistrate Judge excused the Pawnee's failure to file a motion to supplement, opting instead to

---

22 Although the Agencies objected to the Farouche declaration and the FEMA Map, they did not object to the well location map, which simply depicts the wells' proximity to one another based on information already provided in the administrative record. The Court therefore permits the well location map attached to the Farouche declaration as a supplement.

23 The Agencies did not object to including the Freeman Letter, and the Court permits it as a supplement.

decide the issue on the merits but still holding the Pawnee to their burden to prove supplementation is proper. *Id.* at 5.

As for the Farouche declaration and its accompanying FEMA map, the Magistrate Judge concluded that that the Pawnee had demonstrated the extra-record evidence satisfied two exceptions permitting supplementation of the administrative record: "(1) agency action that is not adequately explained and cannot be reviewed properly without considering the cited materials, and (2) . . . an agency record [which] is deficient because the agency ignored relevant factors it should have considered in making its decision." *Order on Mot. to Strike* at 8 (citing *Garvey*, 256 F.3d at 1027 n.1).

As for the Pawnee Nation officials' and individual members' declarations, the Magistrate Judge concluded the declarations may supplement the administrative record "solely for the purpose of establishing [the Pawnee's] standing." *Id.* at 5-6 (citing *U.S. Magnesium, LLC v. United States Env't Protection Agency*, 690 F.3d 1157, 1165 (10th Cir. 2012)). In their opposition to the motion to strike, the Pawnee explained that their declarations were offered for the limited purpose of establishing standing. *Opp'n to Mot. to Strike* at 4. In reply, the Agencies agreed that standing declarations are generally permissible but moved to strike the portions of the declarations irrelevant to standing. *Defs.' Reply* at 5. Although the Magistrate Judge noted the Pawnee's merits brief appeared to cite the declaration in support of merits arguments, she rejected the Agencies' request to strike the portions irrelevant to standing, because she would "not predict what facts may be relevant to any standing

analysis conducted by the district court or on appeal." *Id.* at 6. Moreover, "[i]f any information is deemed irrelevant to standing issues that may arise," the Magistrate Judge explained, "the district or appellate court may simply decline to consider the extraneous information." *Id.*

The Court agrees with the Magistrate Judge's observation that the Pawnee's merits brief, which does not address standing, cites the declarations in support of some of its arguments. *Id.* at 5 n.3 (citing *Pls.' Brief* at 8-10, 13). Moreover, the Court notes that the Pawnee's opposition to the Agencies' motion to strike, aside from standing, did not argue that the declarations qualified under an applicable exception for extra-record materials. Nor did the Pawnee file a subsequent motion to supplement the administrative record. Accordingly, given the Pawnee's disavowal of any reliance on the declarations in support of their merits position and because it is their burden to prove an exception applies to supplementation of the administrative record, the Court will not consider the declarations where the Pawnee cite them in support of their merits position. In contrast, the Court will consider the Farouche declaration, the FEMA map, wells location map, and the Freeman Letter as appropriate supplements where relevant to the subsequent discussion.

**B. Mootness**

A court lacks subject-matter jurisdiction if a case is moot. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). "'Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction.'" *Disability Law Ctr. v.*

*Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). "The crucial question is whether granting a present determination of the issues offered will have some effect in the real world." *Wyoming v. United States Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (quoting *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)). "[M]ootness is found when events outside the litigation make relief impossible." *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011) (quoting 13C WRIGHT & MILLER, FED. PRAC. & PROC. § 3533.3.1, at 56 (3d ed. 2008)). "In a moot case, a plaintiff no longer suffers a redressable actual injury. But an action is not moot if a plaintiff has a concrete interest, however small, in the outcome." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quotations omitted).

In the context of NEPA and NHPA, redressability exists and mootness does not apply if an agency may still affect conditions relating to the subject land. *See, e.g.*, *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000) (discussing "changes [that could] still be made to help alleviate any adverse effects" of NEPA and NHPA violations); *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 948 F.2d 1436, 1446 (5th Cir. 1991) (explaining where NHPA responsibility was triggered but unfulfilled, case was still an active controversy because "it is impossible . . . to know with any degree of certainty just what the end result of the NHPA process would be"). "[W]hen an expired permit's conditions remain in effect, so too does the case and controversy." *Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 406 (6th Cir.

2013). Put differently, jurisdiction remains if projects may be reauthorized or additional projects may be approved based on the same underlying and allegedly unlawful procedures. *Id.*; *see also Diné Citizens Against Ruining Our Env't v. Jewell*, 312 F. Supp. 3d 1031, 1089 (D.N.M. 2018) (rejecting mootness argument regarding active and planned wells and only mooting case insofar as it addressed wells that were permanently abandoned), *aff'd in part, rev'd in part, & remanded sub nom. Diné I*, 923 F.3d 831.[24]

The Agencies contend that most of the agency actions challenged by the Pawnee "are already moot" because six of nine drilling permits have expired. *Defs.' Opp'n* at 6. They argue that any operators who wanted to drill additional wells "would have to secure a lease[ ] and submit new [drilling permit applications] to BLM for approval." *Id.* at 7. However, the Agencies do not address the EAs upon which the expired drilling permits applications depend. As the Pawnee explain, the three EAs at issue—one for the Francis-Double R9 well pad, one for the Gertie well pad, and one for the Taylor well pad—do not expire and provide the basis for approving both the expired and active drilling permit applications. *Pls.' Reply* at 2. In the Pawnee's estimation, because the EAs have not expired, "[a]bsent a ruling from this Court, nothing would prevent the Agencies from re-issuing [new] drilling permits" on those same well pads "based on the same flawed [documents]." *Id.*

The Court agrees with the Pawnee. As explained in more detail below, these EAs are a prerequisite to the drilling permit applications upon which the Agencies

---

24 The parties did not appeal the district court's mootness decision. *Diné I*, 923 F.3d at 838 n.2.

focus. Because the Agencies could still issue new permits based on those assessments, a live controversy remains. The Pawnee's challenge to the six approved drilling permit applications that expired are therefore not moot, because the basis for their approval—the EA—has not expired.

**C. Executive Order 11,988 on Flood Plain Management**

E.O. 11988 "directs Federal Agencies to . . . avoid actions located in or adversely affecting floodplains unless there is no practicable alternative." Exec. Order No. 11988, 42 Fed. Reg. 26,951 (May 24, 1977). "The purpose of [E.O.] 11988 is 'to avoid to the extent possible the long and short term adverse impacts associated with occupancy and modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative.'" *Prairie Band Pottawatomie*, 684 F.3d at 1018 (quoting Exec. Order No. 11988).

The Pawnee argue the Agencies violated E.O. 11988 because they failed to address the fact that the Francis-Double R-9 wells are located on the Cimarron River's floodplain. *Pls.' Brief* at 20-21. Attached to their merits brief, the Pawnee provide a FEMA floodplain map showing that the Francis-Double R9 well pad falls within a 100-year floodplain. *See Farouche Decl.* at 4-5.

The Agencies contend their experts properly concluded the Francis-Double R9 well pad area is not located in a floodplain. *Defs.' Opp'n* at 22-23. They have two citations for this claim. First, they reference "Floodplains (Appendix E)" in a list of "elements . . . determined . . . to not be present" with the well pad area.[25] The

[25] FR#1-APD-AR-0000012; DR9#1-APD-AR-000029.

referenced Appendix E does not exist in the record, however.[26] Next, they reference a check-marked box stating floodplains were not present, present in a section labeled "Consultation/Coordination" which included "resource specialists . . . that specifically participated and provided input in review of the proposed project and development of this EA document."[27] Though this page states that natural resource specialist Jackie Badley reviewed the project on May 18, 2015, it says nothing about Ms. Badley's methodology.[28]

The record does not explain how the "no floodplain" conclusion was reached or cite any alternative floodplain map used by the agency. Although the record states that an on-site visit occurred and that "other data" was consulted, it does not explain how the on-site visit, the Environmental Solutions report, or "other data" led to the conclusion. Nor do these supporting documents appear to be part of the record.

EO 11988 defines floodplain as "the lowland and relatively flat areas adjoining inland and coastal waters including floodprone areas of offshore islands, including at a minimum, that area subject to a one percent or greater chance of flooding in any given year." Exec. Order No. 11988, 42 Fed. Reg. 26,951 (May 24, 1977). The FEMA map appears to indicate that the approved site fits this definition, because it lies within a 100-year floodplain, or an area with a one percent or greater chance of flooding in any given year. If there are reasons the FEMA map is irrelevant to the

---

26 *Compare* FR#1-APD-AR-0000083-89/DR9#1-APD-AR-0000100-106 (Appendix D) *with* FR#1-APD-AR-0000090-91/DR9#1-APD-AR-0000107-08 (Appendices F & G).

27 FR#1-APD-AR-0000065; DR9#1-APD-AR-000082.

28 *Id.*

Agencies' decision, is not an important factor in the decision, or was deemed incorrect based on better "onsite" evidence, the Agencies offer no explanation in their briefing. Nor is it clear from the record before this Court.

Agency action is arbitrary and capricious if, among other situations, it offers an explanation "that runs counter to the evidence before the agency" or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *High Country Conservation Advocs. v. United States Forest Serv.*, 951 F.3d 1217, 1222 (10th Cir. 2020) (quotation omitted). The Agencies do not explain the discrepancy between their no-floodplain finding and FEMA's 100-year floodplain map. Nor do they explain the discrepancy between their finding and the Francis-Double R9 cultural resources inventory stating that the "study areas are entirely within the Cimarron River floodplain."[29] BLM acknowledged receipt of this document on February 26, 2015, relied on it for NHPA purposes, and indicated Ms. Badley was the natural resources specialist assigned to the matter.[30] Yet a few months later, on May 18, 2015, Ms. Badley selected a "not present on site" checkbox regarding floodplains.[31] The Agencies' reliance on their own documentation is implausible given their scarce reasoning and the contradictory evidence. Given this, the Court concludes the Agencies were arbitrary and capricious in disregarding E.O. 11988.

---

[29] FR#1-APD-AR-0000840; DR9#1-APD-AR-0000922.

[30] FR#1-APD-AR-0000082; DR9#1-APD-AR-0000099.

[31] FR#1-APD-AR-0000065; DR9#1-APD-AR-0000082.

### D. National Environmental Policy Act

"NEPA requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of the preferred course of action as well as reasonable alternatives." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009). "NEPA specifically requires agencies to 'take a hard look at environmental consequences' of a proposed action.'" *Diné II*, 59 F.4th at 1034 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). "The 'twin aims' of NEPA are to require agencies to 'consider every significant aspect of the environmental impact of a proposed action' and to facilitate public involvement." *High Country Conservation Advocs.*, 951 F.3d at 1223 (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).

"To comply with NEPA, agencies must prepare a detailed statement of the environmental impact of any 'major Federal action[ ] significantly affecting the quality of the human environment.'" *Diné I*, 923 F.3d at 851 (quoting 42 U.S.C. § 4332(2)(C)). This document may be an Environmental Impact Statement (EIS) or an EA: an EIS is required "if a proposed action will significantly affect the quality of the human environment," whereas a "considerably less detailed" EA is required if "an agency is uncertain whether the proposed action will significantly affect the environment." *Id.* (quotations omitted). The document prepared must contain "sufficient discussion of the relevant issues and opposing viewpoints to enable the agency to take a hard look at the environmental impacts of the proposed action and

its alternatives, and to make a reasoned decision." *High Country Conservation Advocs.*, 951 F.3d at 1223.

Although "NEPA prescribes the necessary process, [it] does not mandate particular results." *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002) (citation omitted). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351; *accord Wyoming*, 661 F.3d at 1237 (NEPA "is strictly a procedural statute" that "does not mandate substantive results").

"[W]hen assessing whether agencies took a 'hard look,'" courts apply "the APA standard of review, determining whether agencies' actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Diné II*, F.4th at 1034 n.7 (quoting 5 U.S.C. § 706(2)(A)).[32] As such, "an agency must examine[ ] the relevant data and articulate[ ] a rational connection between the facts found and the decision made." *Richardson*, 565 F.3d at 713 (alterations in original) (quotation omitted). Courts "consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument." *Id.* (citing *Utahns*, 305 F.3d at 1165). Courts "may also consider non-NEPA documents that have been incorporated by reference into the NEPA documents." *Diné II*, 59 F.4th at 1034 (citing 40 C.F.R. § 1502.21 (requiring agencies

[32] The Tenth Circuit does not "view 'hard look' as a requirement going beyond the APA standard of review" or applying a "heightened standard." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1256 n.2 (10th Cir. 2019) (citing *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-16 (2009)).

to "incorporate material into an [EA] by reference" to "cut down on bulk")). Courts also apply a "presumption of validity . . . to the agency action and the burden of proof rests with the appellants who challenge such an action." *Richardson*, 565 F.3d at 704 (quotation omitted).

In short, "[t]he role of a federal court under NEPA is to review the . . . EA" and "ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Diné I*, 923 F.3d at 851 (quotation omitted). Courts do not "decide the propriety of competing methodologies" but rather "determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Silverton Snowmobile Club v. United States Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006) (quotation omitted). "In conducting this review," courts apply "a rule of reason standard to determine whether claimed NEPA violations are merely flyspecks, or are significant enough to defeat the goals of informed decision making and informed public comment." *Diné I*, 923 F.3d at 852 (quotation omitted).

Finally, "[i]t is axiomatic" that when an agency "materially" changes or "contradict[s]" previous findings, "the agency would need to provide a 'reasoned explanation' for the difference." *Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Fed. Commc'n Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "[U]nexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA." *Id.* (alteration in original) (quoting *Organized Vill. of Kake v. United States Dep't of Agric.*, 795 F.3d 956, 969 (9th Cir. 2015) (en banc)).

The Pawnee claim the Agencies' EAs do not evidence a "hard look" at five topics: (1) proximity to the Cimarron River floodplain, (2) water withdrawals from the Cimarron River, (3) proximity to residential property, (4) risk of earthquakes and seismic activity, and (5) cumulative impact.

### 1. Proximity to Cimarron River Floodplain – Francis-Double R9 Environmental Assessment

First, the Pawnee argue that the Francis-Double R9 well pad's EA violates NEPA because it did not address the potential impacts of oil and gas development so close to the Cimarron River and within its floodplain because the EA incorrectly states the wells are a half mile from the river rather than 600-700 feet away. *Pls.' Brief* at 7-9. The Pawnee point out that the EA itself acknowledges that oil and gas operations generally can contaminate surface water resources but never address the risks to the River, including how its close proximity to the River increases those risks or mitigating measures that may be taken. *Id.* at 8. The Pawnee maintain these risks were entirely foreseeable and therefore NEPA required the Agencies to address them. *Id.* Additionally, the Pawnee insist the Agencies' inaccurate description of the wells' location from the Cimarron River is sufficient evidence that the Agencies acted arbitrarily capriciously in approving the drilling permits on the Francis-Double R9 well pad. *Id.* at 8-9.

The Agencies argue that they fully assessed and disclosed the drilling's impact to the Cimmaron River and its floodplain as required by NEPA. *Defs.' Opp'n* at 9-10. They point to the EA's discussion of potential impact to water resources, including (1) sedimentation from increased erosion, contamination from drilling chemicals,

disruption of normal flow patterns, and localized depletion of surface water, (2) potential for spills or other contamination, (3) Oklahoma law prohibiting pollution, mitigation measures to limit pollution, (4) conditions of approval designed to mitigate risk, including erosion controls, impervious liners, dikes and berms, sumps, and drilling cellars, and (5) the impact of hazardous materials if spilled, but noting it is uncommon given the several layers of safety and precaution taken to prevent hazardous waste's release. *Id.*[33] The Agencies do not address the Pawnee's argument about the EA incorrectly stating that the Francis-Double R9 wells were approximately half a mile from the River rather than 600-700 hundred feet away.

The Court agrees with the Pawnee that the operations' proximity to the Cimarron River merited a "harder look" than the Agencies gave it. Although the Francis-Double R9 EA states the Cimarron River is approximately 0.45 or 0.5 miles south of the well pad[34] and that there is "[o]nly one unnamed drainage [area]" within 500 feet of the project area,[35] in actuality, those wells are within 600-700 feet of the Cimarron River on land within its floodplain.[36] This is not a trivial error; the risk of erosion and pollution from oil and gas development is clearly more significant within 700 feet of the Cimarron River and within its floodplain than at a distance approximately a half mile away. The Agencies' argument that it nonetheless

---

33 FR#1-APD-AR-0000027-30, 49-53; DR9#1-APD-AR-44-47, 66-70.

34 FR#1-APD-AR-0000027, 40; DR9#1-APD-AR-0000044, 57.

35 FR#1-APD-AR-0000050; DR9#1-APD-AR-0000067.

36 FR#1-APD-AR-0000428; FR#3-SUNDRY-CW-0000007; *Farouche Decl.* at 5. Additionally, the Francis-Double R9 cultural resource inventory noted that its study area was "entirely within the Cimarron River floodplain." FR#1-APD-AR-0000840.

considered those risks in its half-mile analysis is therefore unavailing. "NEPA does not permit an agency to remain oblivious to differing environmental impacts . . . simply because it understands the general type of impact likely to occur." *Robertson*, 565 F.3d 707; *id.* ("[A]nalyzing the likely impacts of building a dirt road along the edge of an ecosystem" does not excuse "an agency from analyzing the impacts of building a four-lane highway straight down the middle[ ] simply because the type of impact—habitat disturbance—is the same under either scenario"); *Cure Land*, 833 F.3d at 1232 ("It is axiomatic" that when an agency "materially" changes or "contradict[s]" previous findings, the agency must "provide a 'reasoned explanation' for the difference") (quoting *Fox Television Stations*, 556 U.S. at 515). This failure to address the risks of oil and gas operations within the Cimarron River's floodplain is an instance of the "uninformed decisionmaking" NEPA prohibits and is therefore arbitrary and capricious.[37]

### 2. Water Withdrawals from the Cimarron River—Francis-Double R9 and Gertie Environmental Assessments

Next, the Pawnee claim the Agencies' sundry notices violated NEPA by failing to address the impact from Crown's withdrawals from the Cimarron River. *Pls.' Brief* at 9-12. According to the Pawnee, NEPA required the Agencies to supplement the

[37] The Pawnee's citation to *Missouri Public Service Commission v. Federal Energy Regulatory Commission*, 337 F.3d 1066, 1075 (D.C. Cir. 2003), for the rule that "reliance on false information 'is the essence of arbitrary and capricious decisionmaking'" is misguided. *Pls.' Brief* at 9; *Pls.' Reply* at 3. In that case, however, it was the agency's knowledge "that there was *no* possibility" that the information relied upon was correct that formed the basis for the D.C. Circuit's statement that "[r]eliance on facts *that an agency knows are false* at the time it relies on them is the essence of arbitrary and capricious decisionmaking." *Mo. Pub. Serv. Comm'n.*, 337 F.3d at 1075 (second emphasis supplied). Although evidence in the record shows that the Agencies were on notice that the Francis-Double R9 well pad was within the Cimarron River floodplain, the Pawnee do not argue that the Agencies knew the stated distance to the Cimarron River was incorrect.

EAs' NEPA analysis before issuing the sundry notices because the EAs did not analyze the impact of any surface water withdrawals from the Cimarron River because, consistent with Crown's own representation, the drilling operation planned to withdraw water from a private source. *Id.* Because the EAs only analyzed the impact from groundwater withdrawals, the Pawnee contend, the Agencies' sundry notice approvals permitting Crown's Cimarron River withdrawals without supplementing their NEPA analyses to include the potential environmental impact from surface water withdrawals from the Cimarron River, rather than the private source, violated NEPA.[38] *Id.* at 10; *Pls.' Reply* at 3-7.

The Agencies argue the sundry notices sundry notices are not subject to NEPA. *Defs.' Opp'n* at 17-19. Even if the sundry notices are subject to NEPA, the Agencies argue, the water withdrawals and wastewater disposals did not present significant new information requiring them to supplement the EAs' NEPA analysis. *Id.* at 19-20. According to the Agencies, the EAs sufficiently analyzed groundwater use and contemplated that Crown's water usage would be relatively minor compared to consumptive irrigation and municipal water use in Oklahoma in recent years. *Id.* at 19-20; *id.* at 11 (The EAs "make clear that overall, the project was not planning to use a significant amount of water, especially in relation to myriad other uses in the basin").

---

38 The parties also dispute whether the Pawnee Nation or individual plaintiffs possess a quantified right to a certain amount of water. *Pls.' Brief* at 11 (discussing Pawnee tribal law); *Defs.' Opp'n* at 11. Because NEPA is a procedural statute, not a substantive one, the Court declines to address this issue. *See Friends of the Floridas v. United States Bureau of Land Mgmt.*, 746 F. Supp. 3d 1039, 1142-43 (D.N.M. 2024) (discussing the law regarding NEPA).

At the time of the EAs, Crown represented that its operation would obtain water from a private source. Consistent with that representation, the EAs's NEPA analyses stated that water "would come from an existing private surface pond" through a contract between Crown and "the third party operator to purchase water from the private source."[39] Instead, however, Crown used water from the Cimarron River for drilling and fracturing activities.[40] The Agencies recognized that this activity violated Crown's permits.[41] Yet BLM permitted the activities to continue by issuing retroactive approvals called of the sundry notices without conducting further NEPA analysis.

An agency is required to perform additional NEPA analysis if a plan is amended or revised. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004) (citing 43 C.F.R. §§ 1610.5-5, 5-6). Amendment occurs, among other times, when there is "a change in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions and decision of the approved plan." 43 C.F.R. § 1610.5-5. "In all cases, the effect of the amendment on the plan shall be evaluated" through an EA or EIS. *Id.* These authorities are fatal to the Agencies' argument that they had "no ongoing duty to supplement the NEPA analysis . . . simply because Crown updated the location of a water intake or used a different water source." *Defs.' Opp'n* at 19. The Agencies admit that they did not

---

39 FR#1-APD-AR-0000020; GERT#3-APD-AR-0000036; TAYLOR-APD-AR-0000020.

40 *See, e.g.*, DR9#1-SUNDRY-CW-0000068; GERT#3-SUNDRY-CW-0000037; DR9#1-SUNDRY-CW-0000203

41 DR9#1-SUNDRY-CW-0000068.

analyze the withdrawal of surface water from the Cimarron River. *Id.* at 11. This admission demonstrates that the Agencies failed to take the "hard look" required by NEPA. Finally, "[i]t is axiomatic" that when an agency "materially" changes or "contradict[s]" previous findings, "the agency . . . need[s] to provide a 'reasoned explanation' for the difference." *Cure Land*, 833 F.3d at 1232 (quoting *Fox Television Stations*, 556 U.S. at 515). "[U]nexplained conflicting findings about the environmental impacts of a proposed agency action violate the APA." *Id.* (alteration in original) (quoting *Organized Vill. of Kake*, 795 F.3d at 969).

The Agencies' cited caselaw in support of their argument that the sundry notice approvals are not major federal action is unconvincing. Both cases present distinct factual scenario, namely that the plaintiffs sought something akin to sua sponte agency review based on what the plaintiffs believed was new information about risks of permit holders' unchanged activities. *See Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (rejecting plaintiffs argument that NEPA required a new EA for agency-approved elk-feeding plans because new independent research—approximately twenty years after the first EA issued—indicated an increased risk of disease among similar elk populations); *see also Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1177-78 (10th Cir. 1999) (rejecting plaintiffs' challenge to agency approval of land developers' plan because new information showed the development would have "dramatic cumulative impacts" where the evidence showed the agency was aware of both the developers' plans and the potential impacts during the initial review process). Unlike those cases, this case presents a change to the terms of the

plan originally set forth. More importantly, in neither *Tidwell* nor *Dombeck* did an agency determine that a permit holder's activity violated its permit's terms or issue a retroactive approval accepting those new activities. The Court therefore rejects the Agencies' argument that acceptance of the sundry notices was not major federal action.

The Court therefore concludes the Agencies' approval of the sundry notices without supplementing the underlying EAs violated NEPA and thus were arbitrary and capricious.

### 3. Proximity to Residential Property—Gertie Environmental Assessment

The Pawnee's next argument is that the Agencies failed to consider the proximity of at least one residential property within "about half a city block" (approximately 225 feet) of the Gertie well pad. *Pls.' Brief* at 12-13. The Pawnee's concerns include risks posed by explosions and "toxic air pollutants associated with oil and gas development." *Pls.' Reply* at 7-8. The Agencies concede they did not analyze the impact on neighboring residences but maintain NEPA does not require an individualized assessment of specific residents' risk. *Defs.' Opp'n* at 16-17. In reply, the Pawnee clarify that they do not seek individualized review of each resident's "sensitivities" but instead challenge the Agencies' failure to consider the risks posed by locating the wells so close to private homes. *Pls.' Reply* at 7.

The Court views this challenge as a close call. "[A]lthough NEPA states its goals in sweeping terms of human health and welfare, these goals are the ends that Congress has chosen to pursue by means of protecting the physical environment."

*Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983) (footnote omitted). In other words, "NEPA seeks to improve the human environment when doing so also promotes physical environmental protection." *Jarita Mesa Livestock Grazing Ass'n v. United States Forest Serv.*, 140 F. Supp. 3d 1123, 1181 (D.N.M. 2015) (citing 42 U.S.C. § 4331(b)).

Tenth Circuit caselaw broadly construes the connection between a NEPA challenger's injury and the physical environment. *Id.* at 1178-80 (collecting cases). The Agencies do not contest that risk to adjacent residence from explosions or toxic air pollutants are sufficiently connected to the physical environment protected by NEPA. They do maintain, however, that the Gertie EA did consider those risks, albeit without explicitly acknowledging the wells' proximity to private residences.[42] *Defs.' Opp'n* at 17. Indeed, the Gertie EA did analyze the impact on air quality and climate, as well as mitigation measures to reduce those risks.[43]

As explained, the Court's review under NEPA is to ensure that the agency has adequately considered and disclosed the environmental impact of its actions. *See Diné I*, 923 F.3d at 851. The Court does not sit in judgment of "the propriety of competing methodologies," but rather "determine[s] simply whether the challenged method had a rational basis and took into consideration the relevant factors." *Silverton Snowmobile Club*, 433 F.3d at 782 (quotation marks omitted). On the one hand, the Agencies' failure to specifically address the Gertie wells' proximity to

---

[42] GERT#3-APD-AR-0000058-62, 76-78 (considering environmental consequences, including air quality, visual quality, climate, scenic value, socioeconomics, environmental justice, and public safety).

[43] GERT#3-APD-AR-0000058-62.

private residences appears to be "unwise" rather than "uninformed" and thus not a violation of NEPA. *See Robertson*, 490 U.S. at 351 ("NEPA merely prohibits uninformed—rather than unwise—agency action"). On the other hand, the Pawnee's briefing suggests this omission is "significant enough to defeat [NEPA's] goals of informed decision making and informed public comment." *Diné I*, 923 F.3d at 852 (internal quotation marks omitted).

When considered in concert with the other deficiencies discussed, the Court cannot conclude that the Agencies' failure to address the environmental impact on nearby residences was a mere "flyspeck." *Id.* The Agencies' failure to address the impact of a well pad built within 225 feet of a private residence is precisely the kind of "significant" omission that defeats NEPA's goals of informed decision making and public comment." *Id.* (internal quotation marks omitted); *High Country Conservation*, 951 F.3d at 1223.

**4. Risk of Earthquakes and Seismic Activity—Francis-Double R9, Gertie, and Taylor Environmental Assessments**

Earthquakes and seismicity are not addressed in the EAs. The Pawnee claim this failure to examine earthquake risk violates NEPA. *Pls.' Brief* at 13-16. They point to data from the timeframe of 2014 to 2016 reflecting high seismic activity in Oklahoma, including earthquakes within a few miles of the relevant drilling sites, indicating that earthquakes were a reasonably foreseeable indirect effect of the Agencies' approval of the drilling permits. *Id.* at 13-14. In response, the Agencies refer to a section of the EAs stating that "[s]pills . . . may be the result of human error . . . while others stem from equipment failure . . . or acts of nature." *Defs.' Opp'n*

at 12. This section goes on to discuss cause, size, hazard rating, response time, and cleanup effectiveness of various types of spills.[44] The Agencies' briefing also offers a variety of explanations regarding earthquakes—for instance, that the impact of the eight wells in question would be negligible when put in context of the approximately 180,000 wells throughout Oklahoma. *Defs.' Opp'n* at 13.

The Court agrees with the Pawnee. First, the EAs minimal reference to "acts of nature" and the ramifications of a spill once it occurs says nothing about the likelihood that such a spill will happen. The EAs' omission of such risk is material. Second, the Agencies' argument that "acts of nature" encompasses the risk of earthquakes is an improper post-hoc rationalization. *Richardson*, 565 F.3d at 704 ("In considering whether the agency took a 'hard look,' [courts] consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument"). Accordingly, the Court concludes the Agencies' failure to consider the risks of earthquakes and seismic activity violates NEPA.[45]

---

[44] FR#1-APD-AR-0000058; DR9#1-APD-AR-0000075; GERT#3-APD-AR-0000074; TAYLOR-APD-AR-0000057.

[45] The Court need not determine the level of detail necessary for a discussion of earthquakes or other natural disasters in an EA, and its ruling should not be construed as a ruling that an extensive discussion of earthquake risk is necessary in EAs or EISs going forward. The Court's ruling, necessarily limited to the facts before it, is simply this: where no look at all has been taken, NEPA's hard look requirement has not been met.

### 5. Cumulative Impact—Francis-Double R9, Gertie, and Taylor Environmental Assessments

Lastly, the Pawnee challenge the "cumulative impact" analysis provided by each of the EAs.[46] The Tenth Circuit has identified five requirements for a meaningful cumulative impact analysis:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Diné II*, 59 F.4th at 1039-40 (quoting *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011)). The Pawnee highlight three perceived deficiencies: (1) the EAs improperly incorporate (or "tier") a 1994 EIS which addressed federally-owned, rather than Indian-owned, minerals, (2) the EAs fail to address the potential for earthquake-related cumulative effects, and (3) each of the three EAs fail to reference the other two despite the geographic proximity of the three well pads. *Pls.' Brief* at 16-19. Because the Court has already discussed the lack of reasoning regarding earthquake risk in the EAs,[47] it will address only the first and third of the Pawnee's challenges.

---

[46] The Court notes that the "cumulative impact" definition briefed by the parties was repealed effective July 16, 2020. 40 C.F.R. § 1508.1(g)(3). The definition applicable at the time of the agency action under review was: "[T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (repealed).

[47] The Agencies claim the EAs' discussion of earthquakes supplemented the EIS discussion. *Defs.' Opp'n* at 15-16. Because, as discussed, the EAs do not discuss earthquakes, the Court cannot find that the EIS was supplemented to include a discussion of seismic activity.

The Agencies claim that tiering to the 1994 EIS was appropriate because the federally-owned minerals discussed in it are not "qualitatively different" from the Indian-owned minerals at issue here. *Defs.' Opp'n* at 14-15. They further claim that incorporating an analysis of the 2.5 million acres of Indian-owned minerals would cause the Agencies to consider a 1.5 million-acre swath of irrelevant Osage County minerals. *Id.* at 14-16. But even if the Court accepted the Agencies' argument about the Osage County minerals,[48] that still leaves 1 million acres of Indian-owned minerals out of the discussion. This omission, say the Pawnee, makes the 1994 EIS "quantitatively incomplete" and thus unsuitable for tiering. *Pls.' Reply* at 11.

The Court finds the Tenth Circuit's decision in *Diné I* instructive. There, estimates predicted that full development of an area implicated by an EA would involve 3,960 new wells. *Diné I*, 923 F.3d at 837. Although "full-field . . . development [was] not at issue" in that case, the Tenth Circuit ruled that development of those wells—even if development was not specifically occurring at the time of the EA—was reasonably foreseeable. *Id.* at 853-54. Since the total development of the wells was reasonably foreseeable, the Tenth Circuit explained, BLM "had to consider the cumulative impacts of all 3,960 wells when it conducted its site-specific EAs." *Id.* at 854. Smilarly here, the development of at least one million acres of Indian-owned minerals was reasonably foreseeable. Because neither the

[48] The Court is skeptical of the Agencies' Osage County argument, as the environmental impact of drilling activity likely does not depend on which agency oversaw the drilling. *See id.* at 14-15 ("[T]he vast majority of those minerals are located in Osage County and are administered under an entirely different regulatory system by BIA, not the BLM") (footnote omitted). But the Court need not decide the correct number of acres to be considered. Whether 1 million or 2.5 million, it is still a significant swath of Oklahoma and must be considered.

1994 EIS nor the instant EAs considers these minerals, they fail to satisfy the third step of the Tenth Circuit's cumulative impact test. *Diné II*, 59 F.4th at 1039 ("A meaningful cumulative impact analysis must identify . . . other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area . . .") (citation omitted).

Regarding the pendency of multiple EAs at the same time, the Supreme Court has long recognized that NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time." *Kleppe v. Sierra Club*, 427 U.S. 390, 409 (1976). If multiple proposals "that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Id.* at 410. "Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action," consistent with NEPA's requirement. *Id.* The Agencies concede that the EAs do not explicitly mention the wells addressed by the other EAs but claim that the EAs "assume and analyze cumulative effects from increased oil and gas development activities" generally. *Defs.' Opp'n* at 16. In other words, the Agencies claim specific consideration of the adjacent well pads was unnecessary because each EA generally refers to "increased oil and gas development activities." *Id.*

Although the Agencies' argument that their consideration of the cumulative impacts of the adjacent well pads are implicit in the EAs' general reference to "increased oil and gas development activities" straddles the line of an impermissible

post-hoc rationalization, the Court is unconvinced that EAs' language evinces the kind of "hard look" at cumulative impacts NEPA requires for "informed decision making and informed public comment." *Diné I*, 923 F.3d at 852 (internal quotation marks omitted); *see also Del. RiverKeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1320 (D.C. Cir. 2014) ("It is apparent that [the agency] did not draft these pages with any serious consideration of the cumulative effects of the other project upgrades," and NEPA required the agency "to assess cumulative impacts by analyzing the Northeast Project in conjunction with the other three projects"). The Court therefore concludes the Agencies failed to meet NEPA's requirement to consider the cumulative impact of the proposed other actions occurring in the same area. *Diné II*, 59 F.4th at 1039 ("A meaningful cumulative impact analysis must identify . . . other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area . . .") (citation omitted).

**E. National Historic Preservation Act**

Section 106 of the NHPA requires that a federal "agency having authority to license any undertaking" first "take into account the effect of the undertaking on any historic property" before approving an expenditure or license related to the property. 54 U.S.C. § 306108 (formerly 16 U.S.C. § 470f). This requirement is governed by numerous federal regulations which establish a procedure generally referred to as the Section 106 process. *See* 36 C.F.R. § 800 *et seq*. "The process is designed to foster communications and consultation between agency officials . . . and other interested

parties such as Indian tribes, local governments, and the general public." *Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). In conducting the Section 106 process, an agency must (1) review existing information on the site; (2) request information from a State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO)[49] on ways to identify historic properties in the area; (3) seek information from interested parties likely to have knowledge about historic properties in the area; (4) make a reasonable and good faith effort to identify and gather information about potential historic properties; and (5) evaluate property on the basis of the National Register criteria to determine eligibility. *Id.* (citing 36 C.F.R. § 800.4(a)-(c)).

The Pawnee claim the Agencies failed to consult or give sufficient NHPA notice to the Pawnee Nation regarding the Taylor and Francis-Double R9 EAs. *Pls.' Brief* at 21-24. The parties do not dispute that the Agencies did consult and give notice regarding the Gertie wells. *See Pls.' Reply* at 14 n. 11.

[49] An Indian Tribe may assume all or part of the SHPO's functions with regard to Tribal lands if, among other things, the Tribe designates a Tribal preservation official to administer the program. In such cases, THPO is the official representative for purposes NHPA consultation. *See* 36 C.F.R. §§ 800.2(c)(2)(i)(A), 800.3(c)(1). Consultation with an Indian Tribe must recognize the government-to-government relationship between the United States and the Tribe, and the consultation should be conducted in a manner "sensitive to the concerns and needs of the Indian tribe." 36 C.F.R. § 800.2(c)(2)(ii). Consultation should provide the Tribe with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii).

### 1. Taylor Well Pad

AR Consultants, Inc. produced a cultural resources report for the Taylor wells on June 11, 2015.[50] The report specified that the study area "is within the Pawnee Nation."[51] BLM sent copies of AR Consultants' report to the SHPO, the Oklahoma Archeological Survey (OAS), BIA Southern Plains Regional Office, the Iowa Tribe, the Sac and Fox Nation, the Kickapoo Tribe, the Wichita and Affiliated Tribes, and the Osage Nation.[52] Notably absent from this list is the Pawnee Nation—despite the report's specific reference to the study area's location within Pawnee Nation land. After the OAS and SHPO concurred with the report and none of the contacted tribes responded with concerns, BLM made a finding of no affected historic properties and incorporated that finding into the Taylor EA.[53] BLM's failure to send the report to the Pawnee Nation constitutes a failure to consult the tribe in violation of NHPA.

The Agencies seem to concede this point, simply arguing that "there would be nothing for the agency to consult on, because no further activity is possible under the expired Taylor [drilling permit application]." *Defs.' Opp'n* at 20. As explained, it is the underlying EA, not the drilling permit application, that matters for the Court's analysis. The Agencies' failure to notify the Pawnee Nation violates NHPA.

---

50 TAYLOR-APD-AR-0000873-921.

51 *Id.* at 885.

52 *Id.* at 86.

53 *Id.*

### 2. Francis-Double R9 Well Pad

AR Consultants also produced a cultural resources report for the Francis-Double R9 wells on February 11, 2015.[54] This report did not note whether the land surveyed was within the Pawnee Nation. On February 27, 2025, BLM sent copies of AR Consultants' report to the SHPO, OAS, the BIA Southern Plains Regional Office, the Iowa Tribe, the Pawnee Nation,[55] the Sac and Fox Nation, the Kickapoo Tribe, the Wichita and Affiliated Tribes, and the Osage Nation.[56] The OAS and SHPO concurred with the report and the BIA Southern Plains Regional Office and Osage Nation responded that they had no current listings in the project area.[57] On March 19, 2015, BLM then made a finding of no affected historic properties, which the Agencies incorporated into the Francis-Double R9 EA.[58]

The Pawnee claim BLM "inexplicably finalized its finding only three weeks after mailing the notice" without first observing a 30-day window for the Pawnee to respond. *Pls.' Brief* at 24. The Agencies insist they satisfied their obligation under NHPA to consult the Pawnee, arguing that they sent the cultural resources report to the Pawnee's cultural resources office and that the Pawnee simply neglected to respond to the report at all. *Defs.' Opp'n* at 21.

---

54 FR#1-APD-AR-0000833; DR9#1-APD-AR-0000915.

55 The Pawnee argue that the notice provided to the Pawnee Nation listed an incorrect location for the proposed wells. *Pls.' Brief* at 24. The Pawnee's citation lists Sections 4, 9, and 10, T18N, R5W. FR#1-APD-AR-000905. But this is the same location mentioned in AR Consultants' report, *see* FR#1-APD-AR-0000835, and on BLM's finding of no affected historic properties. S*ee* FR#1-APD-AR-0000082.

56 FR#1-APD-AR-0000082; DR9#1-APD-AR-0000099.

57 *Id.*

58 *Id.*

The Agencies' argument is non-responsive to the Pawnee's claim. NHPA requires the Agencies to make a reasonable and good faith effort to consult with the Pawnee about the Francis-Double R9's potential impact on historic resources. *See Pueblo of Sandia*, 50 F.3d at 859. "[A] mere request for information is not necessarily sufficient to constitute the 'reasonable effort'" NHPA requires. *Pueblo Sandia*, 50 F.3d at 860. Furthermore, "a good faith effort to identify historic properties" requires informed consultation, which includes a 30-day window for the THPO to object to the Agencies' findings. *Id.* at 862; 36 C.F.R. § 800.4(b).

Critically, BLM finalized its findings before the 30-day window closed and before they received a response from the Pawnee's THPO. The Agencies do not dispute they failed to observe the 30-day objection window. Instead, they argue the Pawnee simply never responded to their notice. *Defs.' Opp'n* at 21. This contention is beside the point, because the Agencies finalized their findings without adhering to NHPA procedure.

The Agencies' conduct here stands in stark contrast to its NHPA consultation regarding the Gertie well pad. On April 2, 2015, Mr. Ryan Howell notified the Pawnee Nation about the Gertie Wells and asked for their input on cultural resource impacts of the proposed wells, explicitly providing that "[a]ny comments or concerns should be addressed within 30 days of receipt of this notice."[59] The Pawnee THPO Allison Black responded on April 14, 2015, concluding "the proposal project location should have no potential to adversely affect any known Archaeological, Historical or

59 GERT#3-APD-AR-0001095.

Sacred Pawnee sites. Therefore, in accordance with 36 C.F.R. § 800.4(d)(1), you may proceed with your proposed project."[60]

The Court therefore cannot conclude the Agencies' satisfied their obligation under NHPA to make a reasonable effort to consult the Pawnee in good faith about the Francis-Double R-9 well pad's potential impact on historic resources and cultural property. *See Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin.*, 843 F.3d 886, 906-08 (10th Cir. 2016) (Because NHPA is a procedural statute, a reviewing court must ensure that the BLM followed the proper procedures in reaching its determination).[61]

**F. Breach of Trust Duty**

Finally, The Pawnee argue that the Agencies' violations of NEPA, NHPA, and E.O. 11988 are also violations of "the government's general trust responsibility to the Pawnee." *Pls.' Brief* at 25. The Agencies contend that the Pawnee's breach of trust claims based on NEPA, NHPA and E.O. 11988 must be dismissed, because they have fully complied with these laws. *Defs.' Opp'n* at 24-25. The Agencies also argue that a violation of these laws "does not automatically give rise to a parallel action for breach of trust." *Id.* at 25.

---

60 GERT#3-APD-AR-0001101.

61 The Pawnee's argument that the notice lists an incorrect location for the proposed wells, appears unsupported by the record. *Pls.' Brief* at 24. The Pawnee's citation lists Sections 4, 9, and 10, T18N, R5W, but this is the same location mentioned in AR Consultants' report and on BLM's finding of no affected historic properties. The Pawnee's reply appears to concede this point. *See Pls.' Reply* at 15 (arguing "the Agencies do not dispute that even when the report went to the Pawnee . . . the Agencies failed to give the Pawnee 30 days to review it"). The Court's conclusion obviates the need to resolve this issue.

On September 14, 2017, Judge Payne issued a partial dismissal order, dismissing the Pawnee's claim for breach of fiduciary duty. *Partial Dismissal Order* at 16. The Pawnee appear to have misunderstood Judge Payne's holding as to their claim for breach of trust. In its briefing, the Pawnee assert that Judge Payne dismissed in part their claim for breach of trust to the extent their complaint alleges "a claim for breach a *fiduciary* trust duty." *Pls.' Brief* at 25 n.16 (quoting *Partial Dismissal Order* at 16) (emphasis supplied); *Pls.' Reply* at 15 n.12. The Pawnee submit that Judge Payne's holding permits them to maintain a claim against the Agencies for a breach of a general trust duty and simply precludes them from arguing breach of a *fiduciary* trust duty. *Pls.' Brief* at 25. The Court does not read Judge Payne's conclusion that way and this Judge will not disturb his conclusion.

Count VI of the Pawnee's amended complaint asserts a claim for breach of trust responsibilities. *Am. Compl.* ¶¶ 92-95. Although titled "Failure to Comply with Trust Responsibilities," Count VI asserts a cause of action under the APA, citing § 706(2)(A). *Id.* ¶ 95. However, in the parties' March 27, 2017 joint status report, the Pawnee stated Count VI asserts both an APA claim and a "non-APA breach of trust theory." *Joint Status Report* at 3 (ECF No. 15). The Agencies disputed whether the Pawnee could assert a breach of trust claim under Count VI and moved to dismiss Count VI, arguing "there is no cause of action for a breach of a trust duty separate from the underlying compliance with the statute[s]" and thus the Pawnee's claims based on various violations of NEPA, NHPA, AIARMA, and E.O. 11988 "or an

unspecified duty to consult" should be dismissed in its entirety. *Fed. Resp'ts' Mot. to Dismiss* at 13-16; *see also Defs.' Opp'n* at 23 (same).

In his partial dismissal order, Judge Payne agreed with the Agencies, concluding that the Pawnee did not "properly plead . . . a claim for breach of a fiduciary trust duty," rather than an APA claim under § 706(2). *Partial Dismissal Order* at 13 (citing *Am. Compl.* ¶ 95). Despite this conclusion, Judge Payne "[n]evertheless . . . analyze[d] whether [the Pawnee] could state a valid claim for relief under" a breach of trust claim, as opposed to an APA claim under § 706(2). *Id.* (citing *Joint Status Report* at 3).

Judge Payne concluded Count VI must be dismissed for failure to state a claim "[t]o the extent [it] alleges a claim for breach of a fiduciary trust duty" but not to the extent it alleges a violation of the APA. *Id.* at 16. As Judge Payne explained, "to bring a claim for breach of trust, the [Pawnee] 'must identify a substantive source of law that establishes specific fiduciary or other duties,'" i.e., a "'specific rights-creating or duty-imposing statutory or regulatory prescription[ ],'" and then "'allege that the Government has failed faithfully to perform those duties.'" *Id.* at 13 (quoting *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003)). As Judge Payne explained,

> Here, [the Pawnee] have not identified any statutes or regulations that give rise to a specific fiduciary duty. [The Pawnee] allege only that the [Agencies] have not complied with NEPA, Executive Order 11,988, NHPA, and AIARMA. *Am. Compl.* ¶¶ 93-94. None of these statutes set forth specific fiduciary trust duties. None of these generally applicable statutes set forth the specific enforceable trust duties that are required to state a valid claim for breach of trust. . . . Accordingly, even if all of the facts plead in the Amended Complaint are accepted as true, [the Pawnee's] alleged breaches of trust equate to a violation of a general trust relationship, which does not set forth a valid cause of action.

> If [the Agencies] violated NEPA, the NHPA, or other statutes of general applicability, [the Pawnee's] recourse lies in a challenge under the APA, or other statutes that provide a cause of action for such a challenge (subject to a proper waiver of sovereign immunity and subject matter jurisdiction). But [the Pawnee] cannot transform an ordinary claim for an APA violation into a breach of trust theory—the Supreme Court requires a specific statute or regulation that gives rise to an enforceable trust duty. That requirement is not present here, and [Count VI] is therefore dismissed in its entirety to the extent it is based on breach of trust duties, because [the Pawnee] have not identified a specific statute or regulation giving rise to a trust duty.

*Id.* at 14-16 (collecting caselaw) (internal citations omitted). In conclusion, Judge Payne granted the Agencies' motion to dismiss Count VI "[t]o the extent [it] alleges a claim for breach of a fiduciary trust duty." *Id.* at 16.

Judge Payne's order is clear. The Pawnee may assert a claim under the APA for violations of NEPA, NHPA, or other statutes of general applicability, but not based on a theory for breach of trust duty. The Pawnee misread the order to distinguish between a *fiduciary* trust duty and a general trust duty. However, it is clear from the order that Judge Payne dismissed Count VI "in its entirety to the extent it is based on breach of trust duties." *Id.* at 15-16. Count VI survived the Agencies' motion to dismiss, Judge Payne concluded, only to the extent the Pawnee's amended complaint asserts a claim under the APA. *Id.* The Court therefore does not reach the Pawnee's breach of trust arguments, as that part of their claim was dismissed by the September 14, 2017 partial dismissal order.

## V. CONCLUSION

The Court therefore ORDERS, pursuant to 5 U.S.C. § 706(2)(A), the following agency actions are set aside for violation of the National Environmental Policy Act, the National Historic Preservation Act, and Executive Order 11,988: the Francis-

Double R9 Environmental Assessment, Finding of No Significant Impact, drilling permit approval, and sundry approvals for water diversion and waste disposal; the Gertie Environmental Assessment, Finding of No Significant Impact, drilling permit approval, and sundry approvals for water diversion and waste disposal; the Taylor Environmental Assessment, Finding of No Significant Impact, drilling permit approval.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of August, 2026